JUDGE KOELTL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TARRUS L. RICHARDSON,

Plaintiff,

- against -

TYSON PRATCHER and RAUDLINE ETIENNE,

Defendants.

12 CV 8451

Civ. Action No:

**COMPLAINT**

Plaintiff Tarrus L. Richardson, by his attorneys Oxman Tulis Kirkpatrick Whyatt &

Geiger, LLP, Richard L. Brodsky, Esq., and Baker & Hostetler LLP, as and for his complaint

against Tyson Pratcher and Raudline Etienne, states as follows:

## PRELIMINARY STATEMENT

1.     This is an action against two senior staff members of the New York State

Comptroller for federal and state constitutional violations and tortious conduct committed under

color of law.   Defendants Tyson Pratcher and Raudline Etienne abused their public positions, and

thereby deprived plaintiff of his constitutional rights and immunities, his employment and his

business interests.   They threatened to withhold investments by the New York State Common

Retirement Fund (the "Common Fund"), the state employees' pension fund, due to the assertion by

plaintiff of his constitutional rights to speak, organize, petition, and otherwise lead and participate

in a broad coalition of minority and women business enterprises ("MWBEs") involved with

legislation to support MWBE opportunities in state contracting, including but not limited to

awarding of state pension fund investment opportunities by the State Comptroller's Office.

Defendants Pratcher and Etienne thus unlawfully abused their positions as investment officials

with the state employees' pension fund to coerce ICV Capital Partners, LLC ("ICV") to terminate Mr. Richardson's employment with and 28 percent ownership interests in ICV, to deprive him of his right to hold specific private employment free from unreasonable government interference, and deny him opportunities to do business with the State Comptroller's Office and the pension fund it manages.

2.      The defendants' actions, as detailed below and established by sworn testimony in a prior business arbitration between Mr. Richardson and ICV, deprived Mr. Richardson of his federal and state constitutional rights to speak freely about a public policy matter, to join in association with like-minded minority and business professionals and to petition the government for legislative change; tortiously interfered with Mr. Richardson's contractual relationship with ICV; tortiously interfered with his prospective business relations with future ICV funds and other separate business opportunities he has been pursuing since ICV terminated him as a result of defendants' actions; and aided and abetted the breach of fiduciary duty by ICV's Managing Partner that has already been established by an award in Mr. Richardson's favor in January 2012 in the business arbitration before JAMS.   On these bases, Mr. Richardson is entitled to judgment against defendants Pratcher and Etienne in their individual capacities, in an amount of actual and punitive damages to be established at trial, together with a permanent injunction plus costs, expenses and attorneys' fees.

## PARTIES

3.      Plaintiff Tarrus L. Richardson is an investment professional with over 20 years of executive experience in private equity, mergers and acquisitions and community leadership.   Mr. Richardson was a founding partner with a 28 percent ownership interest in ICV, a leading African-American-owned private equity investment firm in New York.   Mr. Richardson was

employed as a Managing Director by ICV on a full-time basis from 1998 until August 23, 2010 when, solely as a consequence of defendants' actions, his employment was terminated by ICV, he was frozen out from his ownership interests, and he was denied and is still being denied the opportunity to do business with the Comptroller's Office and the Common Fund.

4.     Defendant Tyson Pratcher is an Assistant Comptroller in the Comptroller's Office where his duties include responsibility for the Common Fund's Emerging Manager Program. The Emerging Manager Program focuses on, among other things, investment funds that are managed by women and minority managers.

5.     Defendant Raudline Etienne was the Chief Investment Officer of the Common Fund from March 2008 until September 2011.   As such, among other duties, she advised the Comptroller on investment decisions in the Comptroller's role as sole trustee of the Common Fund.

## JURISDICTION AND VENUE

6.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 over claims arising under 42 U.S.C. §§1981 and 1983.

7.     Supplemental jurisdiction exists over plaintiff's common law claims pursuant to 28 U.S.C. §1367.

8.     Venue is proper in the district pursuant to 28 U.S.C. §1391(b) because the claims arose here, plaintiff Tarrus L. Richardson resides here and defendants conduct their business here.

## FACTUAL BACKGROUND

**Mr. Richardson's Successful Private Equity Career At ICV**

9.      In 1998, Mr. Richardson co-founded ICV in partnership with Willie E. Woods, the Initiative for a Competitive Inner City, a not-for-profit founded by Harvard Business School Professor Michael Porter, and American Securities, a large institutional private equity firm.   Mr. Richardson owned a 28 percent interest in ICV and was managing director of the firm until his August 2010 termination.   His responsibilities at the firm extended to all areas and functions of the business:   raising capital and maintaining investor relations; sourcing deals; leading due diligence; serving on the firm's investment committee; managing deals and overseeing portfolio companies, including Board of Director seats on firm-owned companies; developing business and marketing; managing vendors and suppliers; creating and maintaining public interest activities and, as the original and long-time partner of the firm's managing partner, Willie L. Woods, performing general executive/management responsibilities within the firm.   During the latter part of his ICV tenure, Mr. Richardson was formally listed as a key man in the firm's fund solicitations.

10.      ICV has at all times been certified as a minority-owned enterprise by virtue of its ownership and management by Messrs. Woods and Richardson.   These two African-American investment professionals trained at the Harvard Business School and in prior Wall Street positions, formed ICV Professionals, LLC, which owned 75 percent of ICV and served as its Managing Member.

11.      Since its inception, ICV has raised $443 million in investment capital for two private equity funds.   The first fund, ICV Partners, LP ("Fund I"), raised approximately $130 million and has invested in and exited from six portfolio companies: Sterling Foods, Chung's Foods, AAMP of America, The Marshall Retail Group, The Hilsinger Company and Innovative

4

Packaging.   Overall, Fund I successfully delivered a net return of approximately 15 percent and was in the top quartile of all private equity funds for its investing vintage year, and above the targeted private equity return of the Common Fund.

12.    ICV Partners, L.P. II ("Fund II") raised approximately $313 million and, as of August, 2010, had acquired four companies:   Entertainment Cruises, Press-A-Print, Marshall and PFM Group.   A fifth company, Mallet & Co., was far along in the acquisition process and Fund II closed the deal in September 2010.   As of ICV's May 2010 audit, Fund II was also generating approximately 15 percent net returns to its investors and was in the top quartile for all private equity funds of its class, and above the targeted private equity return of the Common Fund.

13.    Mr. Richardson received three streams of compensation for his ICV work:

    (a)    Base salary paid by ICV Capital Partners, LLC;

    (b)    Carried interest in portfolio companies' investments; and

    (c)    Distributions of profits from ICV through ICV Professionals, LLC.

14.    In 2009, Mr. Richardson led one of the largest and most successful investments ever at ICV, the acquisition of the PFM Group, a nationwide financial advisor and consultant to state and local governments and not-for-profits.   That year, he received his best performance review ever from ICV and he was recognized with two significant industry awards: the National Association of Investment Companies/Marathon Club's Deal of the Year award on behalf of ICV for leading the PFM investment and the Toigo Foundation's Visionary Leadership Award for excellence in financial services.

15.    Mr. Richardson was a successful leader and contributor to ICV's profitable business.   In the final ruling in a private arbitration, the arbitrator concluded it is largely undisputed that prior to August 2010, ICV had no reason to consider terminating Mr. Richardson's

5

employment with ICV.   Mr. Woods acknowledged that Mr. Richardson had his best performance review ever in 2009 and that there was no hint of conduct that could have led to his termination.

16.    Nevertheless, based on the words, deeds and directives of defendants, ICV concluded that Mr. Richardson's participation with the MWBE Coalition and the MWBE legislation upset the Comptroller's Office and threatened ICV's business with the Common Fund and it terminated Mr. Richardson's employment in August 2010.

17.    As an additional consequence of defendants' acts, after Mr. Richardson's employment with ICV was terminated, Mr. Woods wrongfully suspended Mr. Richardson's distributions in ICV Capital Partners, LLC which were based on Mr. Richardson's ownership in ICV Professionals, LLC.   Mr. Richardson's eligibility to participate in the ownership in unfunded portfolio investments in Fund II was also wrongfully discontinued.

**A 2010 Study Commissioned by the New York State Legislature Found Both Statistical and Anecdotal Evidence of Business Discrimination Against MWBEs**

18.    In April 2010, a disparity study commissioned in 2006 by the New York State Legislature found both statistical and anecdotal evidence of business discrimination against MWBEs in the New York market.   As of 2010, the Common Fund had uneven results in providing access and opportunity to MWBEs across all asset classes, and in several major asset classes had less than 5% of its discretionary investment dollars contracted with MWBEs.   In general, the Common Fund's failure to find and contract with MWBEs is part of a broader systematic problem of creating unwarranted barriers for MWBEs by favoring older funds over newer funds, creating artificial size of investment barriers, and failing to provide equal access and the opportunity for all to compete.   The National Association of Investment Companies ("NAIC"), a trade association representing MWBE investment managers, recently released a

6

report entitled "Recognizing the Results" which found that diverse and minority private equity

firms, despite outperforming the general private equity market from 1998-2011, managed only

0.24% of total private equity assets.

**Advocacy For Minority Business Enterprises Has Always Been Of Fundamental Interest To Mr. Richardson**

19.     Mr. Richardson has long been a leader in trade associations and non-profit

organizations that advocate for greater access to capital for MWBEs by supporting their growth

and development and raising awareness of the investment opportunities in low income and

underserved communities in the U.S. Emerging Domestic Market.   Mr. Richardson views these

activities as an essential part of his commitment to his community and the nation, and they have

been a hallmark of his personal and business activities.   They have also been crucial in expanding

the recognition of the value of the MWBE sector by business and government, especially in New

York.

20.     In New York, Mr. Richardson played an instrumental founding role in the Council

of Urban Professionals ("CUP"), a not-for-profit association that seeks to connect, empower and

mobilize urban professionals, and led a years-long effort to improve the legal status of MWBE

programs.   Mr. Richardson was a co-founder of CUP in 2006, and served as its founding Board

Chair from 2007 through 2010.   The organization has grown in its first five years of operation into

a substantial force in the New York business and civic communities, with a professional network

of over 10,000 members, over 60 corporate partners, a paid staff of ten and an annual operating

budget of approximately $1.5 million.   CUP oversees over 50 events and programs annually.

When Mayor Bloomberg unveiled his multi-year $130 million Young Men's initiative to build

opportunities for young minority men in New York City, described by the <u>New York Times</u> as

City Hall's most ambitious public policy initiative, he chose to do so at a CUP event.

21.     Mr. Richardson's activities through CUP and other community involvements have

included, among many other things, leadership, research and sponsorship of public conferences

and events regarding issues affecting access to capital and entrepreneurial opportunities for

MWBEs, and organization of the Emerging Manager and Plan Sponsor Conference, a highly

successful annual meeting of minority- and women-owned investment firms, institutional

investors and public pension funds.   It was one of these advocacy actions, in support of the New

York State MWBE Coalition, that led to the events that give rise to this action.

## In 2009, An Historic New York MWBE Coalition Formed And Successfully Advocated For Four MWBE Bills

22.     As a result of his successful business career and public interest efforts, in the fall of

2009, Mr. Richardson (together with other senior CUP officials) was approached by key members

of the Governor's multi-agency MWBE Task Force about creating an advocacy group of minority

and women trade associations and private companies that would support legislation in 2010 to

strengthen New York State's commitment to use and include MWBEs in state contracting.   This

effort followed substantial, multi-year efforts by the MWBE Task Force and others that included a

completed in-depth needs assessment study commissioned by the Governor's MWBE Task Force

and substantial though largely unsuccessful work to improve on the then-existing MWBE law

enacted two decades previously.

23.     Mr. Richardson and CUP considered the opportunity presented by the Governor's

MWBE Task Force representatives and decided to act.   They established a statewide MWBE

Coalition and raised over $100,000 to run a professional MWBE advocacy campaign.   Two CUP

board members served as co-chairs of the MWBE Coalition.   Funded through the efforts of Mr. Richardson and CUP, the Coalition hired a professional to coordinate all aspects of the advocacy effort including recruiting coalition members and financing its efforts.   It hired other professionals to educate and advocate for stronger MWBE laws.   It retained a law firm to provide drafting support for the new MWBE legislation.   It commissioned research on MWBE legislation across the nation.   It hired a public relations firm to manage communications, provided outreach to thousands of MWBEs, and organized efforts which brought over 300 coalition members to the State Capitol to educate legislators and promote the pending legislation.

24.     The MWBE Coalition organized and included over 10,000 minority and women businesspeople, 20 trade associations, including CUP, NAIC, the Women's Builders Council, the New York State Federation of Hispanic Chambers of Commerce and others, leading civil rights organizations such as the NAACP, the National Urban League, One Hundred Black Men, and Rainbow PUSH, and professional associations such as the National Bar Association.   The Coalition also organized and included over 20 private companies, including ICV.   Mr. Richardson played an ongoing leadership role in this effort, working with others to lead the coalition, which worked with legislative leaders to make crucial decisions, and addressing these issues on an almost daily basis.

25.     Four MWBE bills were introduced in the Spring of 2010.   Most significantly, these included S.6888 which sought for the first time to apply the State's MWBE targets and initiatives to state pension plans, including the Common Fund, the New York State Teachers Retirement System, the New York State Insurance Fund and others.   The pension funds covered by the four proposed MWBE bills control over $250 billion of assets.   Less than ten percent of those assets had been awarded to MWBE firms to manage despite research demonstrating that

9

MWBE fund managers perform in the top half of all fund managers.   Seeking to remedy this inequity, the minority investment community has had a history of organizing and working in coalitions to educate elected officials and to advocate for MWBE legislation.   In addition to New York State, similar pension fund MWBE legislation has been successfully advocated for and passed in Illinois, Maryland and Texas.

26.     S.6888 was sponsored by Senator Ruth Hassel-Thompson and Assemblywoman Crystal Peoples-Stokes (the "Bill Sponsors"), both of whom have long personal histories of advocacy on MWBE issues and both of whom are experienced legislative leaders who have chaired the State's Black, Puerto Rican, Hispanic and Asian Legislative Caucus, the principal legislative coalition advocating for the interests of people of color in Albany.   Additionally, over sixty members of the Legislature co-sponsored the bill.

27.     The Comptroller's Office did not support this bill.   In the Spring of 2010, representatives from the Comptroller's Office expressed concern with portions of the proposed legislation.   Among other concerns, the Comptroller's staff raised issues especially with two provisions of the bill: (1) the inclusion of a fifteen percent numerical target (a goal not an unconstitutional quota) for the allocation of state pension fund contracts to MWBE firms; and (2) a preference for doing business with firms located within the State of New York.   Initially the Bill Sponsors resisted the Comptroller's request to delete these two sections from the bill. Nevertheless, at the end of the 2010 legislative session, both sections were removed from S.6888 and it was passed by both houses and was signed into law by Governor David Paterson on July 15, 2010.

**Mr. Richardson Was Pressured By The Comptroller's Office To Modify The Proposed Legislation To Suit The Political Views Of The Comptroller's Office**

28.     On or about June 10, 2010, Mr. Richardson and defendant Pratcher spoke for approximately five minutes during a lunch break at the Emerging Manager and Plan Sponsor Conference.   Mr. Pratcher mentioned that the Comptroller's Office was having a problem with the legislation and that minority and women legislators, and certain unions, were calling his office saying that the Comptroller, Etienne and Pratcher were not supporting MWBEs because of their opposition to the MWBE bill, S.6888.   Mr. Pratcher, a political appointee of Comptroller Thomas P. DiNapoli and head of the Common Fund's Emerging Manager Program, was concerned these criticisms could hurt the Comptroller during an election year and in anticipation of a highly competitive general election in November 2010.   He asked Mr. Richardson what he could do to convince others in the MBWE Coalition to agree to remove two provisions from the MWBE legislation: the fifteen percent numerical target and the in-state focus.

29.     Mr. Richardson told Mr. Pratcher that the Bill Sponsors wanted to negotiate directly with the Comptroller, and not via the Comptroller's staff or members of the MWBE Coalition.   Mr. Richardson also told Pratcher that, in general, minority legislators believed they had helped to get Assemblyman DiNapoli appointed as State Comptroller in 2007, when the Legislature filled the vacancy created by the previous Comptroller's resignation, with Mr. DiNapoli's express commitment that he would hire a diverse staff.   Mr. Richardson also explained to Mr. Pratcher that the minority legislators believed that this was a unique moment in time, the first in 40 years, with sympathetic majorities in both the Assembly and the State Senate and a Governor determined to reform the MWBE laws.   As a result, the Bill Sponsors believed the

11

opportunity to pass MWBE legislation in 2010 was "bigger than any one currently in office" given the fact that these favorable conditions might not (and did not) survive the 2010 election.

30.     Mr. Pratcher repeated his request for removal of the two provisions.   Mr. Richardson acknowledged Mr. Pratcher's request and responded that there was little he or the MWBE Coalition could do at this point other than to pass the message along to the Coalition's lobbyist and to encourage the Comptroller to speak directly with the Bill Sponsors.   By the conclusion of the discussion, it was obvious to Mr. Richardson that Mr. Pratcher and the Comptroller's Office had a clear, substantive disagreement with Mr. Richardson and the MWBE Coalition over the appropriate content of the pending MWBE legislation.

31.     That same evening, Mr. Richardson attended the annual gala of the Toigo Foundation, the organization that had given him a fellowship to attend Harvard Business School and that, the year before, had honored him with the Visionary Leadership Award.   At the dinner, Mr. Richardson ran into Raudline Etienne.   She told Mr. Richardson that she had spoken with Tyson Pratcher about his earlier conversation with Mr. Richardson, and she asked Mr. Richardson to call her the next day.   The next day, on or about June 11, 2010, Mr. Richardson spoke with Ms. Etienne about the concerns raised by Mr. Pratcher and the two provisions of S.6888 that the Comptroller's Office was strongly contesting, and Mr. Richardson repeated to Ms. Etienne what he told Mr. Pratcher; namely, that the Bill Sponsors wanted to negotiate directly with the Comptroller rather than the Comptroller's Office.   Mr. Richardson offered to call the MWBE Coalition's representative to inquire as to whether there was anything the Coalition could do to further the negotiations.   He then spoke with the Coalition's representative who spoke with the Bill Sponsors.   Once again, the Bill Sponsors emphatically instructed the Coalition to "put their pens down" as the Bill Sponsors felt it was their job, not the job of anyone in the Coalition, to

12

negotiate directly with the Comptroller's Office.   Mr. Richardson reported the Bill Sponsors'

response, as conveyed to him from the Coalition's representative, to defendants Pratcher and

Etienne.   Ultimately, in high-level negotiations at the end of the legislative session, the

Comptroller's Office was successful at getting most of what it wanted removed from the bill: no

fifteen percent target and no in-state focus, as well as reduced reporting requirements and no

requirement that MWBEs be defined as fifty-one percent owned and controlled by minorities or

women.   S.6888 was enacted with a unanimous vote in the Senate and a majority in the Assembly.

Gov. Paterson signed the bill into law.

### After The Legislation Was Enacted, Defendants Etienne and Pratcher Retaliated Against Mr. Richardson

32.     In July 2010, after S.6888 had been passed by the Legislature and signed into law

by the Governor, defendant Pratcher passed word to an ICV investor that the Comptroller's Office

had a problem with ICV because of the MWBE legislation.   The Common Fund was an investor

in Fund II and, at the time, ICV had a proposal for a $10 million investment in a planned new fund,

ICV Growth, pending before the Comptroller's Emerging Manager Program.   The ICV investor

informed Willie Woods of the comments made by Mr. Pratcher and suggested that he reach out to

both defendants Pratcher and Etienne to deal with the situation.

33.     The ICV investor helped Mr. Woods schedule two separate meetings, one with Mr.

Pratcher and one with Ms. Etienne, regarding their complaints about ICV.   Both meetings were

held during official business hours at the Comptroller's Office in Manhattan.

34.     At the meetings, defendants Pratcher and Etienne criticized and complained about

Mr. Richardson to his managing partner for his role in the MWBE Coalition, for his advocacy for

the legislation that covered the Common Fund, and for Mr. Richardson's speech, lack of

13

helpfulness with respect to their issues with the legislation, and particular statements that he was alleged to have made to these state officials regarding this public policy matter.

35.     No concerns were ever expressed regarding the performance of ICV or Mr. Richardson in their capacities as investors of state pension fund money; the grievances were solely limited to issues arising in connection with the association of ICV and Mr. Richardson with the MWBE Coalition, the petitioning of the state government in connection with the MWBE legislation, and Mr. Richardson's speech in connection with this public policy matter.

36.     At the meetings, defendants Pratcher and Etienne made professional and personal attacks in retaliation against Mr. Richardson in a manner designed to and with the concrete effect of jeopardizing his business interests with ICV.   Acting under color of law as State investment officials and dealing with a firm that had in the past received Common Fund investment capital to manage, and expected to continue to receive Common Fund investment through a then-pending application, these State officials expressed an unwillingness to do business with ICV due to their politically-based dispute with Mr. Richardson, stating that ICV was to choose between its partner, Mr. Richardson, and its key investor, the Common Fund.   Indeed, Mr. Woods has testified under oath that Mr. Pratcher told him: **"it's going to be tough for us to do business with somebody who has somebody like Tarrus on his team."**   As a result of defendants' actions and statements, Mr. Woods left those meetings with the understanding that his firm's ability to raise additional investment capital from the Common Fund was in jeopardy due to Mr. Richardson's continued tenure with ICV and the Comptroller's staffers' animosity toward Mr. Richardson.

37.     As a result of the coercive messages delivered to Mr. Woods by Mr. Pratcher and Ms. Etienne at these meetings, on August 23, 2010, ICV terminated Mr. Richardson's employment and his future participation in all ICV partnership investments and from that time forward froze

14

him out of all participation and investment rights in ICV and its funds.   ICV's harmful actions were taken with the overt, significant encouragement of state officials Pratcher and Etienne, and were taken in concert with Pratcher and Etienne.

38.     At the time, Mr. Woods acknowledged to Mr. Richardson that retaliation and political pressure from the defendants was the reason for ICV's action against Mr. Richardson.   In an email to Mr. Richardson on August 13, 2010, Mr. Woods wrote that the problem was "how NYS are feeling about you and ICV" and "[y]ou're [sic] handling of the NYS situation."

39.     In the subsequent JAMS arbitration Mr. Richardson brought against ICV, Mr. Woods testified repeatedly that Mr. Pratcher and Ms. Etienne clearly and unequivocally expressed animosity toward Mr. Richardson and stated that the Common Fund would not invest in any future funds organized by ICV so long as Mr. Richardson was a partner.   The sole source and subject of Mr. Pratcher's and Ms. Etienne's animosity was Mr. Richardson's alleged words and activity concerning the MWBE Coalition's legislative effort.   Mr. Woods further testified that this problem with a major investor, the Common Fund, was a grave concern for ICV and played a substantial cause in ICV's employment action against Mr. Richardson.   As a result of this and other evidence, the arbitrator ruled in favor of Mr. Richardson and awarded him $4.7 million.

**Defendants' Retaliation Against Mr. Richardson Created A Chilling Effect Within The MWBE Coalition**

40.     The MWBE Coalition was an unprecedented and effective associational effort to petition the state government.   It was the first time that New York minority and women professionals, entrepreneurs, and trade associations representing over 10,000 minority- and women-owned businesses/professionals united with civil rights organizations to hire professional staff, representatives and other professionals to advocate for legislation and public policy to help

underserved and underrepresented communities.   With the passage of four MWBE bills in July

2010, it proved to be an effective advocacy coalition.

41.     Since the termination of Mr. Richardson's employment from ICV in August 2010,

defendants' retaliatory actions against Mr. Richardson have had a chilling effect on the efforts by

CUP and the MWBE Coalition to advocate on behalf of MWBEs.   In addition to Mr. Richardson,

several other CUP or MWBE Coalition members' firms have been terminated as investment

managers from the Common Fund within 12 months of the passage of the legislation, and several

other CUP or MWBE Coalition members' firms hoping to do business with CRF have yet to be

awarded business.   Over 25 percent of CUP Board members resigned within a year of Mr.

Richardson's termination from ICV (all of whom either do business with or are hoping to do

business with the Common Fund).

42.     In November 2010, a special meeting with CUP's Board members, including Mr.

Richardson, was called to discuss the situation involving Mr. Richardson and the Comptroller's

Office.   Mr. Richardson then had private conversations with CUP's Board members about the

potential harm CUP and its members faced if he continued as its Board chair.   In deference to

other Board members who feared retaliation if Mr. Richardson remained the chair of CUP's

Board, Mr. Richardson chose to stand down as the Board chair and not run for reelection in

December 2010.

43.     In November 2010, Mr. Richardson served a notice of intention to file a claim

against the defendants.

44.     In December 2010, as a direct result of defendants' retaliatory actions against Mr.

Richardson, CUP's board elected to discontinue all of its MWBE advocacy efforts, including the

MWBE Coalition, out of fear of retaliation by Comptroller DiNapoli's staffers.

45.     Defendants' retaliatory actions against Mr. Richardson have caused and are causing him continuing harm in terms of his ability to generate and obtain new business and employment opportunities, as well as embarrassment, professional reputational injury and emotional distress.   His efforts to obtain investment opportunities with several potential investors who work with the Common Fund have run into insurmountable road blocks that, on information and belief, are the result of the damage done to Mr. Richardson's reputation resulting from defendants' retaliatory actions against him, including but not limited to retaliatory actions by defendants involving the Common Fund, ICV and third-party investors and institutions.

## AS AND FOR A FIRST CAUSE OF ACTION
## PURSUANT TO 42 U.S.C. §1983 (FREEDOM OF SPEECH)

46.     Plaintiff repeats and realleges the allegations of each of the preceding paragraphs.

47.     42 U.S.C. §1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state . . . subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured in an action of law, suit or equity . . . .

48.     The First Amendment to the United States Constitution provides:

> Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

49.     In any communication or interaction with defendants in connection with the MWBE legislation, Mr. Richardson was exercising rights and privileges protected by the First Amendment and under 42.U.S.C. 1983.

50.     In July 2010, defendants Pratcher and Etienne retaliated against Mr. Richardson for his speech advocating for S.6888 as part of the MWBE Coalition by communicating to an ICV

investor and directly to Mr. Woods their dissatisfaction with Mr. Richardson due to his political

activity and conduct and conveyed that the Common Fund would not make future investments

with ICV as long as Mr. Richardson remained an ICV partner.

51.     Defendants' retaliatory actions were motivated or substantially caused by Mr.

Richardson's exercise of his First Amendment-protected right to freedom of speech.

52.     The defendants' retaliatory actions chilled Mr. Richardson's constitutional right to

free speech and damaged and harmed him, interfered in his First Amendment right to speak

publicly on a public policy matter, and deprived him of his chosen profession, his employment and

his business interests.

53.     Plaintiff has sustained both economic and non-economic losses as a result of the

actions of defendants and demands actual and punitive damages in an amount to be determined at

trial, plus costs, expenses and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## AS AND FOR A SECOND CAUSE OF ACTION PURSUANT TO NEW YORK STATE CONSTITUTION ARTICLE 1, SECTION 8 (RETALIATION FOR VIOLATION OF FREEDOM OF SPEECH)

54.     Plaintiff repeats and realleges the allegations of each of the preceding paragraphs.

55.     New York State Constitution Article 1, Section 8 provides:

> Every citizen may freely speak, write and publish his or her sentiments on
> all subjects being responsible for the abuse of that right; and no law shall be
> passed to restrain or abridge the liberty of speech or of the press . . .

56.     In any communication or interaction with defendants in connection with the

MWBE legislation, Mr. Richardson was acting in furtherance of interests protected under Article

1, Section 8 of the State Constitution.

57.     In July 2010, defendants Pratcher and Etienne retaliated against Mr. Richardson for

his speech advocating for S.6888 as part of the MWBE Coalition by communicating to an ICV

investor and directly to Mr. Woods their dissatisfaction with Mr. Richardson due to his political activity and conduct and conveyed that the Common Fund would not make future investments with ICV as long as Mr. Richardson remained an ICV partner.

58.     Defendants' retaliatory actions were motivated or substantially caused by Mr. Richardson's exercise of his constitutionally-protected right to freedom of speech.

59.     The defendants' retaliatory actions chilled his constitutional right to free speech and damaged and harmed Mr. Richardson, interfered in his constitutional right to speak publicly on a public policy matter, and deprived him of his chosen profession, his employment and his business interests.

60.     Plaintiff has sustained both economic and non-economic losses as a result of the actions of defendants and demands actual and punitive damages in an amount to be determined at trial, plus costs, expenses and attorneys' fees.

## AS AND FOR A THIRD CAUSE OF ACTION PURSUANT TO 42 U.S.C. SECTION 1983 (FREEDOM OF ASSOCIATION)

61.     Plaintiff repeats and realleges the allegations of each of the preceding paragraphs.

62.     Defendants Pratcher and Etienne acted in a manner that stifled plaintiff's First Amendment right of free association by communicating to an ICV investor and directly to Mr. Woods their dissatisfaction with Mr. Richardson due to his associational activity and conduct in his CUP and MWBE Coalition roles, and conveyed that the Common Fund would not make future investments with ICV as long as Mr. Richardson remained an ICV partner.

63.     Defendants' retaliatory actions were motivated or substantially caused by Mr. Richardson's exercise of his First Amendment-protected right to freedom of association.

64.     The defendants' retaliatory actions deprived Mr. Richardson of his constitutional right to free association and damaged and harmed Mr. Richardson, interfered in his constitutional right to associate with those of his choosing on a public policy matter, and deprived him of his chosen profession, his employment and his business interests.

65.     Plaintiff has sustained both economic and non-economic losses as a result of the actions of defendants and demands actual and punitive damages in an amount to be determined at trial, plus costs, expenses and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## AS AND FOR A FOURTH CAUSE OF ACTION (PURSUANT TO NEW YORK STATE CONSTITUTION ARTICLE 1, SECTION 9) (FREEDOM OF ASSOCIATION)

66.     Plaintiff repeats and realleges the allegations of each of the preceding paragraphs.

67.     New York State Constitution Article 1 Section 9 (1) provides in part:

>   No law shall be passed abridging the rights of the people peaceably to assemble and to petition the government, and any department thereof...

68.     Defendants Pratcher and Etienne acted in a manner that stifled plaintiff's rights under Article 1, Section 9 of the State Constitution to free association by communicating to an ICV investor and directly to Mr. Woods their dissatisfaction with Mr. Richardson due to his associational activity and conduct in his CUP and MWBE Coalition roles, and conveyed that the Common Fund would not make future investments with ICV as long as Mr. Richardson remained an ICV partner.

69.     Defendants' retaliatory actions were motivated or substantially caused by Mr. Richardson's exercise of his constitutionally-protected right to freedom of association.

70.     The defendants' retaliatory actions deprived Mr. Richardson of his constitutional right to free association and damaged and harmed Mr. Richardson, interfered in his constitutional

right to associate with those of his choosing on a public policy matter, and deprived him of his chosen profession, his employment and his business interests.

71.     Plaintiff has sustained both economic and non-economic losses as a result of the actions of defendants and demands actual and punitive damages in an amount to be determined at trial, plus costs, expenses and attorneys' fees.

## AS AND FOR A FIFTH CAUSE OF ACTION PURSUANT TO
## 42 U.S.C. §1983 (RIGHT TO PETITION THE GOVERNMENT)

72.     Plaintiff repeats and realleges the allegations of each of the preceding paragraphs.

73.     Defendants Pratcher and Etienne acted in a manner that stifled plaintiff's First Amendment right to petition the government by communicating to an ICV investor and directly to Mr. Woods their dissatisfaction with Mr. Richardson due to his associational activity and conduct in his CUP and MWBE Coalition roles, and conveyed that the Common Fund would not make future investments with ICV as long as Mr. Richardson remained an ICV partner.

74.     Defendants' retaliatory actions were motivated or substantially caused by Mr. Richardson's exercise of his First Amendment-protected right to petition the government.

75.     The defendants' retaliatory actions deprived Mr. Richardson of his constitutional right to petition the government and damaged and harmed Mr. Richardson, interfered in his constitutional right to legitimately attempt to influence government action by lobbying and advocating on behalf of a piece of legislation, and deprived him of his chosen profession, his employment and his business interests.

76.     Plaintiff has sustained both economic and non-economic losses as a result of the actions of defendants and demands actual and punitive damages in an amount to be determined at trial, plus costs, expenses and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## AS AND FOR A SIXTH CAUSE OF ACTION PURSUANT TO
## NEW YORK STATE CONSTITUTION ARTICLE 1, SECTION 9
## (RIGHT TO PETITION THE GOVERNMENT)

77.     Plaintiff repeats and realleges the allegations of each of the preceding paragraphs.

78.     New York State Constitution Article 1 Section 9 (1) provides in part:

> No law shall be passed abridging the rights of the people peaceably to
> assemble and to petition the government, and any department thereof...

79.     Defendants Pratcher and Etienne acted in a manner that stifled plaintiff's rights under Article 1, Section 9 of the State Constitution to petition the government by communicating to an ICV investor and directly to Mr. Woods their dissatisfaction with Mr. Richardson due to his associational activity and conduct in his CUP and MWBE Coalition roles, and conveyed that the Common Fund would not make future investments with ICV as long as Mr. Richardson remained an ICV partner.

80.     Defendants' retaliatory actions were motivated or substantially caused by Mr. Richardson's exercise of his constitutionally-protected right of freedom to petition the government.

81.     The defendants' retaliatory actions deprived Mr. Richardson of his constitutional right to petition the government and damaged and harmed Mr. Richardson, interfered in his constitutional right to legitimately attempt to influence government action by lobbying and advocating on behalf of a piece of legislation, and deprived him of his chosen profession, his employment and his business interests.

82.     Plaintiff has sustained both economic and non-economic losses as a result of the actions of defendants and demands actual and punitive damages in an amount to be determined at trial, plus costs, expenses and attorneys' fees.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## (TORTIOUS INTERFERENCE WITH CONTRACT)

83.    Plaintiff repeats and realleges the allegations of each of the preceding paragraphs.

84.    Plaintiff's employment and partnership relationships with ICV were set forth in several agreements, including: ICV Professionals, LLC Amended and Restated Limited Liability Company Agreement; ICV Capital Partners, LLC Second Amended and Restated Limited Liability Company Agreement; ICV Associates Amended and Restated Limited Liability Company Agreement; ICV Associates II Amended and Restated Limited Liability Company Agreement, ICV Partners II, L.P. Amended and Restated Limited Partnership Agreement.

85.    Defendants knew that plaintiff was employed by ICV and that he was a partner in ICV, including in Fund II.

86.    The retaliatory actions by defendants Pratcher and Etienne described above were designed to lead to, and led to, ICV's termination of Mr. Richardson's employment and partnership with the firm.

87.    Defendants' retaliatory actions proximately caused ICV's termination of its employment and partnership contracts with Mr. Richardson, and damaged him in an amount of actual and punitive damages to be determined at trial.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS)

88.    Plaintiff repeats and realleges the allegations of each of the preceding paragraphs.

89.    Defendants Pratcher and Etienne knew as of the date of their statements to Mr. Woods and others regarding plaintiff of the Common Fund's relationship with ICV and that ICV

was in the process of organizing planned new funds ICV Fund III and ICV Growth and continuing to make ICV Fund II investments.

90.     Defendants knew that plaintiff was a member of ICV and as such, plaintiff would benefit from and participate as a partner in the success of these successor ICV investments.

91.     Defendants Pratcher and Etienne, by using wrongful means, intentionally and deliberately interfered with Mr. Richardson's prospective participation in ICV Fund III, ICV Growth and future ICV Fund II investments as well as in terms of his ability to generate and obtain new business and employment opportunities with several potential third-party investors and institutions which work with the Common Fund.

92.     As a result of the actions of defendants, plaintiff has sustained and is continuing to sustain economic damages from lost prospective business relations that must be remedied through issuance of a permanent injunction and in an amount of actual and punitive damages to be determined at trial.

## AS AND FOR THE NINTH CAUSE OF ACTION
## (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY)

93.     Plaintiff repeats and realleges the allegations of each of the preceding paragraphs.

94.     As Mr. Richardson's partner in ICV and the managing member of ICV Professionals LLC, Willie Woods owed fiduciary duties to Tarrus Richardson, including a duty of loyalty.

95.     A JAMS arbitrator has previously entered an award against Mr. Woods and in favor of Mr. Richardson due to Mr. Woods' breach of his fiduciary duties owed to Mr. Richardson.

96.     As a result of buckling under the pressure from defendants Etienne and Pratcher, and engaging in the actions suggested by Etienne and Pratcher, rather than standing behind his

fellow partner, Mr. Woods breached his fiduciary duty to Mr. Richardson when he withheld

distributions and information owed to Mr. Richardson subsequent to terminating Mr. Richardson's

employment with ICV.

97.     By admonishing Mr. Richardson to Mr. Woods and making coercive threats

concerning the Common Fund's relationship with ICV during July 2010 meetings with Mr.

Woods, defendants Pratcher and Etienne aided and abetted and induced Mr. Woods' breach of

fiduciary duties he owed to Mr. Richardson.

98.     As a direct and proximate result of their aiding and abetting the breach of fiduciary

duties owed by Mr. Woods, defendants have injured Mr. Richardson in an amount of actual and

punitive damages to be determined at trial.

<u>**JURY DEMAND**</u>

Plaintiff requests trial by jury of all issues and claims set forth in this complaint.

**WHEREFORE**, plaintiff Tarrus L. Richardson respectfully requests he be awarded

judgment against defendants Pratcher and Etienne in their individual capacities, in an amount of

actual and punitive damages to be established at trial, together with a permanent injunction against

defendants' tortious interference with business relations, plus costs, expenses and attorneys' fees.

Dated: November 19, 2012

OXMAN TULIS KIRKPATRICK WHYATT
& GEIGER LLP

By: _____
Stuart E. Kahan, Esq.

120 Bloomingdale Road, Suite 100
White Plains, New York 10605
(914) 422-3900
(914) 422-3636 (Fax)
skahan@oxmanlaw.com

25

RICHARD L. BRODSKY, ESQ.

By: _____

155 White Plains Rd., Suite 102
Tarrytown, New York 10591
(914) 332-4940
richardbrodsky@msn.com

BAKER & HOSTETLER LLP

By: _____
         John Siegal

45 Rockefeller Plaza
New York, N.Y.   10111
(212) 589-4200
(212) 589-4201 (Fax)
jsiegal@bakerlaw.com

*Attorneys for plaintiff Tarrus L. Richardson*

26