**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**TARRUS L. RICHARDSON,**

                    **Plaintiff,**                    **12 Cv. 8451 (JGK)**

          **- against -**                    <u>**OPINION AND ORDER**</u>

**TYSON PRATCHER and RAUDLINE ETIENNE,**

                    **Defendants.**

---

**JOHN G. KOELTL, District Judge:**

     Tarrus Richardson brings this action against defendants Tyson Pratcher and Raudline Etienne for alleged violations of 42 U.S.C. § 1983, the New York State Constitution, and New York common law.  Richardson alleges that Pratcher and Etienne, employees of the Office of the New York State Comptroller (the "OSC"), retaliated against him because he promoted legislation contrary to the OSC's interests, and thereby violated his rights under the First Amendment of the United States Constitution and article I, sections 8 and 9 of the New York State Constitution. Richardson also claims that the defendants tortiously interfered with his partnership contracts and tortiously interfered with various prospective business relations.[1]  The defendants moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for

---

[1]     The complaint includes a claim for aiding and abetting a breach of fiduciary duty; the plaintiff voluntarily dismissed this claim with prejudice.

summary judgment on all causes of action.  This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a). For the reasons explained below, the defendants' motion is granted in part and denied in part.

I.

The standard for granting summary judgment is well established.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might

2

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Indian Harbor Ins. Co. v. City of San Diego, 972 F. Supp. 2d 634, 637 (S.D.N.Y. 2013).

## II.

The parties do not dispute the following facts unless otherwise noted.

**A.**

Richardson co-founded ICV Capital Partners, LLC ("ICV"), a New York based private equity firm, with Willie Woods. During the relevant time, Richardson was a managing director of ICV and had an ownership interest in ICV and its operating entities. Woods is a co-founder, a managing director, and the managing member of ICV. American Securities is a partial owner of ICV, and Michael Fisch is the President and CEO of American Securities.

During the relevant time period, Etienne served as the Deputy Comptroller for Pension Investment and Cash Management and as the Chief Investment Officer ("CIO") of the New York State Common Retirement Fund (the "CRF"). The CRF is the pension fund for New York State employees and participating local governments and private employees. As CIO, Etienne managed the CRF, which required her to approve any investment partners. Pratcher—operating under Etienne's supervision—was the Director of the Emerging Managers Program. The Emerging Managers Program identifies CRF investment opportunities for relatively small and new asset managers. As Director, Pratcher evaluated and monitored prospective and existing Emerging Managers Program investments.

The CRF invests in private equity funds directly and indirectly through "funds-of-funds" managers, who then invest in

4

CRF-approved funds.  When Richardson worked at ICV, the CRF
indirectly invested in two ICV funds: ICV Partners I, L.P. ("ICV
Fund I") and ICV Partners II, L.P. ("ICV Fund II").  In 2009,
ICV commenced fundraising for a new fund, ICV Growth Fund ("ICV
Growth").

**B.**

The Council of Urban Professionals ("CUP") is an
organization that advocates for minority and women
professionals, and Richardson served as the chair of its board
from 2007 to 2010.  In the fall of 2009, CUP hired Seth Bryant,
who was also a founding member of CUP, to draft legislation
promoting CRF investment in minority and women-owned business
enterprises ("MWBEs").  Also in 2009, CUP hired two lobbyists,
Jacqueline Williams and Larry Scherer, to promote the same
legislation.

On February 22, 2010, New York State Senator Ruth Hassell-
Thompson introduced Senate Bill 6888 in the New York Senate, and
Assemblywoman Crystal Peoples-Stokes (with others) introduced
Assembly Bill 9976 in the New York State Assembly.  The bill,
collectively referred to here as S.6888, largely tracked
language drafted and prepared by CUP members—including
Richardson—and its advisors.  As introduced, S.6888 contained a
provision calling for the OSC to invest at least fifteen percent
of externally managed CRF assets with emerging managers (the

"fifteen percent provision") and another defining emerging managers as MWBEs with a significant presence in New York (the "New York focus provision").[2]

Between March 2010 and June 2010, OSC staff participated in a series of meetings with state legislators, CUP representatives, and others regarding S.6888.  Internally and in these meetings, OSC staff expressed concern that the fifteen percent provision violated the New York State Constitution and that the New York focus provision risked retaliation by other states.  Pratcher and Etienne attended a number of these meetings.  (Etienne Dep. Tr. 87, 152-53; Pratcher Dep. Tr. 160-61, 211-14.  Richardson did not attend meetings with the OSC, but he discussed the S.6888 negotiations with CUP board members, representatives, and other bill advocates and supported S.6888 through in-person, phone, and e-mail advocacy.

### C.

On June 10, 2010, Richardson and Pratcher attended a conference at the Westin New York Hotel in Times Square.  During a break in the proceedings, Richardson and Pratcher—who until then had a cordial relationship—ran into each other in a

---

[2]    The parties dispute whether these provisions were mandatory.  (See, e.g., Defendants' Statement of Material Facts ¶ 230; Plaintiff's Response to Statement of Material Facts ¶ 230.) The resolution of this dispute has no bearing on this motion.

hallway.  Although both parties substantially agree that they discussed S.6888, Pratcher and Richardson provide significantly different accounts of the conversation.  (Pratcher Decl. ¶¶ 31-34; Richardson Decl. ¶¶ 32-36.)

Pratcher claims Richardson stated that he had sufficient votes to pass S.6888 regardless of the Comptroller's opposition, that he would tell the press the Comptroller and Pratcher "did not care about the interests of black people," that he "was responsible for getting [Pratcher] his job," that there would be "retaliation" against the Comptroller for opposing S.6888, that the bill was "bigger" than Pratcher's or the Comptroller's job, and that he did not care what Pratcher "thought, because he had a business to build." (Pratcher Decl. ¶¶ 31-33.)  Pratcher described Richardson as "agitated," "aggressive," and "hostile" and considered his behavior during the conversation "rude," "unprofessional," "confrontational," and "completely inappropriate." (Pratcher Decl. ¶¶ 34, 36.)  Pratcher also was surprised that Richardson would display such behavior in a "public setting" with "one of his investors." (Pratcher Decl. ¶¶ 34-35.)

Richardson disputes the tone and substance of the conversation.  While discussing the bill, Richardson admits he told Pratcher that 2010 "was a unique time for passage of MWBE legislation," that it was "too late for CUP . . . to directly

7

negotiate with him and the OSC," and that the bill was "bigger" than any individual.  (Richardson Decl. ¶¶ 33–36.)  Richardson describes the conversation as "active," but not "loud," "angry," or "argument[ative]."  (Richardson Dep. Tr. 236–37.)  Richardson maintains that he never referred to S.6888 as "my legislation," that he did not state he would tell the press that the Comptroller and Pratcher did not care about black people, that he did not imply he was responsible for Pratcher's job, and that he did not assert his business was more important than Pratcher's job.  (Richardson Decl. ¶ 36.)

Pratcher then returned to the OSC office and informed Joe Dawson and Etienne about his conversation with Richardson.  (Etienne Decl. ¶ 28; Pratcher Decl. ¶ 36.)  Dawson does not recall the details of his conversation with Pratcher, but remembers that Pratcher "seemed visibly shaken by it."  (Dawson Dep. Tr. 148–53.)  Dawson later informed Woods, Richardson's employer and partner, that Pratcher and Etienne were upset with Richardson.  (Woods Arb. Dep. Tr. 282, 287.)

That same night, Etienne and Richardson attended a gala at the American Museum of Natural History in Manhattan.  When Etienne and Richardson left the event, they had a brief conversation about S.6888.  Both agree that the conversation was short, that Richardson mentioned he wished the OSC staff had informed him about their concerns earlier, and that they agreed

to speak by phone over the weekend.  (Etienne Decl. ¶ 29;
Richardson Decl. ¶ 39.)  However, Etienne and Richardson provide
very inconsistent accounts of the tone of the conversation.
Etienne claims that she was "taken aback by Richardson's
approach and demeanor" and asserts that Richardson followed her
after she attempted to end the conversation.  (Etienne Decl. ¶
29.)  Richardson recalls the discussion differently.  Richardson
claims that he first complimented Etienne on her receiving an
award at the gala and that the two then had a "quiet
conversation" as they left the event.  (Richardson Decl. ¶ 39.)

     As promised, Richardson called Etienne twice over the June
12-13, 2010, weekend.  Both agree that Richardson informed
Etienne that the S.6888 bill sponsors had taken responsibility
for drafting and amending the bill.  (Etienne Decl. ¶ 30;
Richardson Decl. ¶ 41.)  However, Etienne also asserts that
Richardson stated that it "was too late for the bill to be
altered," a statement she believed to be false.  (Etienne Decl.
¶ 30; Etienne Dep. Tr. 135-38.)  Richardson claims that he only
informed Etienne that the bill sponsors had asserted primary
responsibility for negotiating with the OSC.  (Richardson Decl.
¶ 41.)

     At some point after their conversations with Richardson,
Etienne and Pratcher separately spoke with Brian Mathis, who was
then a CUP board member.  Etienne and Pratcher claim that Mathis

informed them that the CUP board had agreed to remove the
fifteen percent and New York focus provisions.  (Etienne Decl. ¶
31; Pratcher Decl. ¶ 37.)  Mathis's recollection of the
conversation is hazy.  He recalls informing Etienne and Pratcher
that he believed CUP members had agreed to remove the two
offending provisions, but cannot recall the details of either
conversation.  (Mathis Dep. Tr. 68-69, 181.)  After her
conversation with Mathis, Etienne "began to question whether
Richardson had been candid with me when he said it was too late
to alter the bill."  (Etienne Decl. ¶ 31.)

On June 17, Bank of America Merrill Lynch Capital Access
Funds ("Bank of America") completed its preliminary due
diligence review of ICV Growth and recommended that the CRF
invest in it.  (Siegal Decl. Ex. 23, at OSC030122, OSC030355.)
Bank of America also explained that it would embark upon the
legal negotiations in the CRF checklist.  (Siegal Decl. Ex. 23,
at OSC030122, OSC030356.)  The same day, Pratcher, on behalf of
the OSC, responded to Bank of America by e-mail.  He wrote:
"Let's discuss tomorrow.  We may want to hold off on legal with
ICV."  (Siegal Decl. Ex. 23, at OSC030122.)  In his declaration,
Pratcher explained that he decided to put ICV Growth on hold
because he had "reservations about the proposed investment" and
because "he wanted time to consider Richardson's conduct during
our conversation on June 10."  (Pratcher Decl. ¶ 39.)

On June 21, 2010, Etienne, Pratcher, the Comptroller, and
other OSC staff met with sponsors of S.6888, including Senator
Hassell-Thompson.  At the meeting, Senator Hassell-Thompson
reprimanded the OSC staff for failing to provide—as it had
promised—compromise language that the OSC and the S.6888
sponsors could support.  (Etienne Decl. ¶ 33; Hassel-Thompson
Dep. Tr. 94–95.)  Pratcher then stated that he believed the OSC
had sent an amended draft of S.6888 to the bill sponsors, but
Senator Hassel-Thompson explained that she had not received a
draft with compromise language.  (Etienne Decl. ¶ 33; Etienne
Dep. Tr. 163; Hassel-Thompson Dep. Tr. 94–95.)  Etienne assumed
that Senator Hassel-Thompson was upset because CUP had promised
to, and then failed to, forward the OSC's draft to the bill
sponsors.  (Etienne Dep. Tr. 160–61; Etienne ¶ 37.)  After the
meeting, Etienne believed that "Richardson, as head of CUP, was
ultimately responsible for whatever failure led to this
disconnect between the legislators and OSC."  (Etienne Decl. ¶
37.)  Pratcher felt the same.  (Pratcher Dep. Tr. 212–17.)

On July 2, 2010, Pratcher had a phone conversation with
JoAnn Price, the co-founder and managing partner of Fairview
Capital Partners.  (Price Decl. ¶ 5.)  Fairview had invested in
both ICV Funds I and II, (Price Decl. ¶¶ 2–3,) and Pratcher
describes Price as a "matriarch of emerging managers."
(Pratcher Dep. Tr. 246.)  During this conversation, Pratcher

11

told Price that Richardson had acted unprofessionally in the
June 10 conversation.  (Pratcher Dep. Tr. 248-49; Price Decl. ¶
6.)  Pratcher also told Price that his conversation with
Richardson "caused [him] to question [Richardson's] integrity
and his judgment" and that it would be difficult for him to
recommend that the CRF invest in funds involving Richardson.
(Pratcher Dep. Tr. 252-54.)  Price then relayed this information
to Woods on July 2, 2010.  (Price Decl. ¶¶ 8-10; Woods Arb. Dep.
Tr. 298-301.)

     The S.6888 bills sponsors agreed to remove the fifteen
percent and New York focus provisions.  The New York Senate
enacted the bill, as amended, on June 30, 2010, and the Assembly
followed suit the next day.  See N.Y. Bill Jacket, 2010 S.B.
6888, Ch. 171.  On July 15, 2010, Richardson and Etienne
attended the bill signing for S.6888.  Etienne claims that
Richardson apologized to her at the event, (Etienne Decl. ¶ 38,)
which Richardson disputes.  (Richardson Decl. ¶ 44.)  Richardson
asserts that he did not apologize because he had no reason to do
so.  (Richardson Decl. ¶ 44.)

     At Woods's invitation, Pratcher and Woods met on July 19,
2010; Dawson also attended this meeting.[3]  (Pratcher Decl. ¶ 46;

---

[3]   Both parties represented at oral argument that Dawson did
not recall the content of the conversation, and his testimony on
the issue was not included in the record.

Woods Decl. ¶ 6; Woods Arb. Dep. Tr. 343.)  Woods and Pratcher
agree that they discussed Pratcher's frustration with
Richardson.  (Pratcher Decl. ¶¶ 46-55; Woods Decl. ¶¶ 7-8.)
According to Woods, Pratcher asked: "How's [Richardson] doing
his job and doing all this legislation?  How's he effective at
the firm?"  Pratcher informed Woods about the "series of issues"
that the OSC had with Richardson concerning S.6888 and stated
that it would be "tough for [the OSC] to do business" with a
firm that "has somebody like [Richardson] on his team."  (Woods
Arb. Dep. Tr. 326, 372; Woods Decl. ¶ 7.)  Woods then told
Pratcher, to his surprise, that Richardson was an at-will
employee at ICV.  (Pratcher Decl. ¶ 52.)  In their respective
declarations, Pratcher and Woods declare that Pratcher never
suggested that ICV should fire Richardson or that the
Comptroller's office would retaliate against ICV for
Richardson's actions.  (Pratcher Decl. ¶ 53; Woods Decl. ¶ 7;
see also Woods Dep. Tr. 117.)  At the end of the meeting,
Pratcher agreed to arrange a meeting between Woods and Etienne.
(Pratcher Decl. ¶ 55; Woods Decl. ¶ 8.)

    Woods and Etienne met on July, 23, 2010.  (Etienne Decl. ¶
40; Woods Decl. ¶ 8.)  Etienne reprimanded Woods for being
unaware of Richardson's June 10 conversations with Pratcher and
Etienne and of Richardson's activities regarding S.6888.
(Etienne Decl. ¶ 40; Etienne Dep. Tr. 220-21; Woods Decl. ¶ 9;

Woods Dep. Tr. 121.)  Woods testified that Etienne expressed
annoyance that Richardson had "been involved in all of [these]
lobbying efforts and not—and doing this job—and [Woods] didn't
do anything about it?"  (Woods Arb. Dep. Tr. 332.)  And,
according to Woods, she questioned how Richardson "[c]ould have
been involved in an activity . . . against one of [ICV's]
largest investors."  (Woods Arb. Dep. Tr. at 332–33.)  Both
Woods and Etienne nonetheless agree that at no point did Etienne
state that Woods should fire Richardson or that the
Comptroller's office would retaliate against ICV for
Richardson's actions.  (Etienne Decl. ¶¶ 41–42; Woods Decl.
¶ 10; Woods Dep. Tr. 133–35.)

        After these conversations, Woods suspended fundraising on
ICV Growth, having failed to attract any investors.  (Woods Arb.
Dep. Tr. 516.)  Although the parties dispute whether ICV Growth
would have attracted investors eventually, Woods explained that
he terminated fundraising because of a "New York State Common
problem."  (Woods Arb. Dep. Tr. 516; see also Woods Arb. Dep.
Tr. 368.)

                                **D.**

        On August 9, 2010, Woods, Fisch, and Richardson met at
ICV's office.  In that meeting, Fisch and Woods presented
Richardson with two options: (1) Richardson could remain at the
firm if he resigned from CUP, relinquished his ownership

                                14

interest in ICV Professionals, engaged in solely ICV approved civic and charitable activities, and agreed to communicate with investors only after prior ICV approval; or (2) Richardson could resign from ICV.  (Richardson Decl. Ex. 3; Woods Decl. ¶ 12.)

On August 13, Richardson e-mailed Woods, asking whether the OSC would invest in ICV funds if Richardson decided to remain at the firm.  (Richardson Decl. Ex. 4.)  Woods responded that there was "no way to know" whether the Comptroller's office would invest if Richardson stayed, and "they certainly are not going to agree to that."  (Richardson Decl. Ex. 4.)  Woods also noted that Richardson's "outside activity (CUP) that has [led] to this problem is something that has been brought to [Richardson's] attention as a concern of the firm many times over the years." (Richardson Decl. Ex. 4.)

After a series of e-mails between Richardson and Woods, Richardson informed Woods that he would not accept either option.  (Feinberg Decl. Ex. 9, at ICSVUB001177-79.)  On August 23, ICV terminated Richardson and informed him that his profit shares for any unfunded portfolio investments would be eliminated and that ICV would later decide whether it would repurchase his interest in ICV and its subsidiaries. (Richardson Decl. Ex. 5.)

**E.**

In November 2010, Richardson submitted to JAMS a demand for arbitration against ICV and Woods.  In January 2012, the arbitrator held that Richardson was entitled to distributions and carried interest from ICV Fund II, but denied his claim for distributions from future funds.  The arbitrator rejected Richardson's claim that American Securities breached any fiduciary duties owed to Richardson, but held that Woods, as the managing member of ICV, owed fiduciary duties to Richardson that were breached.  The arbitrator rejected Richardson's claims for equitable relief and for a violation of the New York Labor Law. (Feinberg Decl. Ex. 18, at 12–13 (Arbitration Opinion).)  The arbitrator also rejected ICV's counterclaim that Richardson breached his agreements with ICV.  (Feinberg Decl. Ex. 18, at 21.)

Richardson brought this action in November 2012, and the defendants moved for summary judgment in February 2014.

**II.**

Pratcher and Etienne argue that they are entitled to qualified immunity on Richardson's claims that the defendants violated his First Amendment rights to freedom of speech, freedom of association, and his right to petition the government.  "Qualified immunity shields government officials from liability for civil damages when they are sued in their

16

personal capacity as a result of their performance of
discretionary functions, and serves to protect government
officials from the burdens of costly, insubstantial lawsuits."
Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995).  The doctrine
protects officials not only from liability but also from the
burdens of litigation, Johnson v. Fankell, 520 U.S. 911, 915
(1997), unless the plaintiff identifies facts showing "(1) that
the official violated a statutory or constitutional right, and
(2) that the right was 'clearly established' at the time of the
challenged conduct."  Wood v. Moss, 134 S. Ct. 2056, 2066-67
(2014) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080
(2011)).  "Under prong two, a '[g]overnment official's conduct
violates clearly established law when, at the time of the
challenged conduct, the contours of a right are sufficiently
clear that every reasonable official would have understood that
what he is doing violates that right.'"  Abrams v. Dep't of Pub.
Safety, --- F.3d ---, No. 13-111-cv, 2014 WL 4099309, at *8 (2d
Cir. Aug. 21, 2014) (alteration in original) (quoting al-Kidd,
131 S. Ct. at 2083).[4]  The Court may exercise its "sound

---

[4]     There is disagreement in this Circuit on "whether the
qualified immunity standard [contains] two or three parts, and
whether the 'reasonable officer' inquiry is part of step two—the
'clearly established' prong—or whether it is a separate, third
step in the analysis."  Bailey v. Pataki, 708 F.3d 391, 404 n.8
(2d Cir. 2013) (collecting cases).  Regardless of when the Court
conducts the reasonable official inquiry, the analysis is the
same.

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

For a right to be clearly established, the plaintiff must define the right with reasonable specificity, the Supreme Court or the Second Circuit Court of Appeals must have confirmed the existence of that right, and a reasonable official must have understood that the defendants' acts were unlawful. Doninger v. Niehoff, 642 F.3d 334, 345–46 (2d Cir. 2011). The plaintiff need not identify a decision finding the "very action in question" unconstitutional. Anderson v. Creighton, 483 U.S. 635, 640 (1987). Rather, the "contours" of the right identified must be "sufficiently clear," id., such that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## A.

The defendants argue that the constitutional rights identified by Richardson—the right of a government contractor to be free from unlawful retaliation for exercising his First Amendment rights of speech, assembly, and petition—are not clearly established. The Court disagrees.

Richardson served as an independent investor for the CRF. The Supreme Court made clear that independent contractors are entitled to the same First Amendment protections as public employees. See Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 677–78 (1996) (holding that independent contractors are protected from retaliation for protected speech "and that the Pickering balancing test, adjusted to weigh the government's interests as contractor rather than as employer, determines the extent of their protection"); O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 726 (1996) (declining "to draw a line excluding independent contractors from the First Amendment safeguards of political association afforded to employees").

The rights to petition, associate, and speak on behalf of pending legislation are sufficiently clear that the defendants should have been on notice that they could not retaliate against contractors for those activities. See Fahs Constr. Grp., Inc. v. Gray, 725 F.3d 289, 291 (2d Cir. 2013) (per curiam) (noting that "independent contractors hired by the State are protected by the First Amendment"); Hous. Works, Inc. v. Turner, 179 F. Supp. 2d 177, 202 (S.D.N.Y. 2001) (holding that "any . . . official who expresses displeasure about any person's exercise of free speech rights and then manifestly subjects that person to adverse action must know that the First Amendment will be

implicated"), aff'd sub nom., Hous. Works, Inc. v. Guiliani,
56 F. App'x 530 (2d Cir. 2003).

Cullinan v. Abramson, 128 F.3d 301 (6th Cir. 1997), an out-
of-circuit case on which the defendants rely, is of no help to
them.  In Cullinan, the plaintiff, an investment manager and
independent contractor for the City of Louisville, alleged that
public officials retaliated against him for his stance on
pension legislation.  Id. at 307.  The Sixth Circuit Court of
Appeals affirmed the district court's dismissal of the claims on
the basis of qualified immunity, holding that the plaintiff
failed to identify a clearly established First Amendment right.
Id. 311-12.  But the alleged constitutional violations in
Cullinan occurred in early 1990s, id. at 305-07, years before
the Supreme Court held that independent contractors enjoy the
same First Amendment protection as government employees, see
Umbehr, 518 U.S. at 677-78.

In the alternative, the defendants argue that the right at
issue here is the freedom of a government contractor to act in a
"rude, condescending, threatening, and offensive" manner towards
a government official.  And, according to the defendants, there
is no case suggesting that the First Amendment protects such
activity.  This, of course, assumes the veracity of Pratcher's
and Etienne's descriptions of their conversations with
Richardson, and it is not the First Amendment right that the

20

plaintiff claims the defendants infringed.  The Supreme Court recently made clear "the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard."  Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014); see also Giacalone v. Abrams, 850 F.2d 79, 85 (2d Cir. 1988) (holding that when determining if a right is clearly established, the Court must "view the record most favorably to [the plaintiff]" and "accept [his] account of the reason for his dismissal" (second alteration in original) (internal quotation marks omitted) (quoting Hawkins v. Steingut, 829 F.2d 317, 319 (2d Cir. 1987))); Davis v. Rhoomes, No. 07cv6592, 2010 WL 3825728, at *8 (S.D.N.Y. Sept. 30, 2010) (rejecting the defendant's attempt to characterize the right in question by "assum[ing] that the plaintiff's version of the facts is untrue").

The plaintiff claims correctly that an independent contractor for a government entity has a clearly established right not to be retaliated against for exercising a First Amendment right.  He does not claim a right to engage in "rude, condescending, threatening, and offensive behavior."  And, of course, he denies that he engaged in such behavior.

## B.

Relying on Pickering v. Board of Education, 391 U.S. 563 (1968), the defendants contend that it was reasonable for them

21

to believe that their actions were lawful.  When a defendant asserts an entitlement to qualified immunity on Pickering grounds, this Court analyzes the argument under the reasonableness prong of the qualified immunity test.  See e.g., Reuland v. Hynes, 460 F.3d 409, 419-20 (2d Cir. 2006); McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278-79 (2d Cir. 1999).  "[I]f any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment.  An officer's actions are objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances."  Lennon, 66 F.3d at 420-21.

In Pickering, the Supreme Court held that public employees do not "relinquish the First Amendment rights they would otherwise enjoy as citizens," but also recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."  391 U.S. at 568.  Thus, the Court held that a government employee's First Amendment rights turn on the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  Id.

In Connick v. Myers, the Court instructed that not all
employee speech is protected: "[W]hen a public employee speaks
not as a citizen upon matters of public concern, but instead as
an employee upon matters of only personal interest, absent the
most unusual circumstances, a federal court is not the
appropriate forum in which to review the wisdom of a personnel
decision taken by a public agency allegedly in reaction to the
employee's behavior." 461 U.S. 138, 147 (1983); see also
Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) ("[T]he First
Amendment protects a public employee's right, in certain
circumstances, to speak as a citizen addressing matters of
public concern."). And in Waters v. Churchill, the Supreme
Court explained that courts must give "substantial weight to
government employers' reasonable predictions of disruption, even
when the speech involved is on a matter of public concern." 511
U.S. 661, 673 (1994). For independent contractors such as
Richardson, "the Pickering balancing test, adjusted to weigh the
government's interests as contractor rather than as employer,
determines the extent of their protection." Umbehr, 518 U.S. at
673.

Therefore, an official may take an adverse action against
an independent contractor for speech on matters of public
concern if: (1) the official's prediction of the disruption that
such speech will cause is reasonable; (2) the potential for

23

disruption outweighs the value of the speech; and (3) the
official took the adverse action not in retaliation for the
speech, but because of the potential for disruption.  Johnson v.
Ganim, 342 F.3d 105, 114 (2d Cir. 2003) (citing Jeffries v.
Harleston, 52 F.3d 9, 13 (2d Cir. 1995)).

　　As all parties agreed at argument on this motion,
Richardson's freedom of association and petition claims are
analyzed under this same test.  See Melzer v. Bd. of Educ., 336
F.3d 185, 195 (2d Cir. 2003) ("We have recognized that where
multiple branches of First Amendment protection are implicated
by an employment decision, the affected rights enjoy no more
protection than each would receive when viewed separately.");
White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1059 (2d
Cir. 1993) ("[R]ight-to-petition claims are also governed by the
above interest-balancing principles.").

　　The defendants do not dispute that Richardson's speech in
support of, political association in furtherance of, and
petition on behalf of S.6888 were made as a citizen on questions
of public concern.  See Mills v. Alabama, 384 U.S. 214, 218
(1966) ("Whatever differences may exist about interpretations of
the First Amendment, there is practically universal agreement
that a major purpose of that Amendment was to protect the free
discussion of governmental affairs.").  When, as here, the
plaintiff's uncontroverted statements relate solely to matters

of public concern, "the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished." <u>Jeffries</u>, 52 F.3d at 13.

Instead, the defendants contend that they spoke to Woods about Richardson's behavior because they reasonably believed that Richardson's conduct showed that he could not be trusted to manage the CRF's assets effectively and efficiently.  Pratcher similarly asserts that he declined to support the CRF's investment in ICV Growth only because his conversation with Richardson raised questions regarding his judgment and professionalism.  An objectively reasonable official, according to the defendants, would conclude that Richardson's behavior was disruptive and this disruption outweighed the value of his speech.

Qualified immunity and <u>Pickering</u> balancing are ordinarily questions of law for the Court to resolve.  See <u>Stephenson v. Doe</u>, 332 F.3d 68, 80-81 (2d Cir. 2003) (qualified immunity); <u>Gorman-Bakos v. Cornell Co-op Extension</u>, 252 F.3d 545, 557 (2d Cir. 2001) (<u>Pickering</u>).  But when the parties dispute "the manner in which" a speech was delivered, whether the speech "had the potential to disrupt" a government function, and "whether even if such disruption occurred, plaintiffs were in fact not dismissed because of the disruption but because of the content of their speech," it is improper "for the district court . . .

to resolve the factual disputes between the parties, or to
decide the proper balance between the parties' interests."
Gorman-Bakos, 252 F.3d at 556–58.  Similarly, when a plaintiff
alleges an official retaliated because of First Amendment
activities, and a "factual issue exists on the issue of motive
or intent, a defendant's motion for summary judgment on the
basis of qualified immunity must fail."  Ganim, 342 F.3d at 117;
see also Mandell v. Cnty. of Suffolk, 316 F.3d 368, 385 (2d Cir.
2003) ("Where specific intent of a defendant is an element of
plaintiff's claim under clearly established law, and plaintiff
has adduced sufficient evidence of that intent to defeat summary
judgment, summary judgment on qualified immunity grounds is
inappropriate.").  Here, qualified immunity turns on material
facts genuinely in dispute.

     With respect to Pratcher, Richardson disputes that he acted
rudely or unprofessionally in their June 10 conversation.  He
claims that he never referred to S.6888 as his legislation,
threatened to go to press, claimed responsibility for Pratcher's
employment, or asserted that his business was more important
than Pratcher's or the Comptroller's job.  (Richardson Decl. ¶
36.)  Nor, according to Richardson, was the conversation loud or
argumentative.  (Richardson Dep. Tr. 236–37.)  Richardson admits
only that he politely told Pratcher that 2010 "was a unique time
for passage of" of S.6888, that it was "too late for CUP . . .

to directly negotiate with him and the OSC," and that S.6888 was "bigger" than any individual, including himself, the Comptroller, and Pratcher.[5]  (Richardson Decl. ¶¶ 33-36; Richardson Dep. Tr. 243-50.)  The Court cannot conclude as a matter of law that these statements—which concerned pending legislation—were so unprofessional that Pratcher could reasonably infer that Richardson could not be trusted with CRF investments or that the OSC's interests outweighed Richardson's rights to speech, assembly, and petition.

With respect to Etienne, Richardson disputes that his demeanor and statements during their June 10 conversation were inappropriate.  He describes the conversation as "quiet" and attests that he informed Etienne that he wished she had told him about the OSC's S.6888 concerns earlier, because the S.6888 sponsors had taken primary responsibility over the bill. (Richardson Decl. ¶ 39; Richardson Dep. Tr. 258-61.)  In his subsequent phone conversations with Etienne, Richardson claims he politely reiterated that the bill sponsors had primary responsibility for S.6888.  (Richardson Decl. ¶ 41.)  Deferring, as the Court must, to Richardson's description of the

---

[5]     Pratcher claims that Dawson, Etienne, Price, and Woods corroborated his account of the conversation.  None of those individuals "corroborated" Pratcher's account; Pratcher simply retold his version of the events to them.  The only witnesses to the conversation between Pratcher and Richardson were those parties.

conversation, Etienne could not reasonably conclude that Richardson's conduct showed that he could not be trusted with CRF investments or that her concerns outweighed Richardson's First Amendment rights.

Both defendants nonetheless assert that a reasonable official would conclude that Richardson acted unprofessionally given the location and time of the conversations. "The 'manner, time, and place' in which the speech occurs is important in determining whether it is protected. For example, the <u>Pickering</u> balance is more likely to favor the government when an employee directly confronts his supervisor with objectionable language than when an employee engages in equivalent speech on his own time and not in front of co-workers." <u>Lewis v. Cowen</u>, 165 F.3d 154, 162 (2d Cir. 1999) (internal citation omitted) (quoting <u>Connick</u>, 461 U.S. at 152).

When viewed in the light most favorable to the plaintiff, neither June 10 conversation occurred at an inappropriate time or location. The conversation with Pratcher, according to Richardson, happened in private, at a conference about MWBE issues in asset management, and during a break in the proceedings. (Richardson Decl. ¶¶ 33-36.) Similarly, the conversation with Etienne was short, cordial, and occurred after the gala finished. (Richardson Decl. ¶ 39). To grant summary judgment on <u>Pickering</u> grounds, the undisputed evidence must show

that the plaintiff's activities were in fact inappropriate.
Compare <u>Blackman v. N.Y.C. Transit Auth.</u>, 491 F.3d 95, 100 (2d
Cir. 2007) (per curiam) (approving summary judgment when the
plaintiffs repeated statements "reveal[ed] him to be a person of
violent disposition, who was potentially deeply disruptive of
the workplace"), <u>and</u> <u>McCullough</u>, 187 F.3d at 276, 278-79
(finding summary judgment appropriate when uncontroverted
evidence showed that an assistant superintendent openly and
repeatedly criticized the district's employees, students, and
curriculum), <u>with</u> <u>Ganim</u>, 342 F.3d at 108, 116-17 (finding
summary judgment on qualified immunity inappropriate when the
parties disputed what information the decisionmaker had when
terminating the plaintiff).  When, as in this case, there are
disputed issues of fact as to the disruptiveness or the
potential disruptiveness of the speech, summary judgment should
be denied.  <u>See</u> <u>Gorman-Bakos</u>, 252 F.3d at 556-58.

    Etienne also asserts that Richardson admitted that he
stated it was "too late" for him to amend S.6888's New York
focus and fifteen percent provisions, that the statement was a
lie because Richardson and CUP continued to advocate on behalf
of those provisions, and that such a lie would raise doubts
about Richardson's judgment with a reasonable OSC official.
(Etienne Decl. ¶¶ 30-31; Etienne Dep. Tr. 135-38.)

Etienne's characterization is disputed.  Richardson claims
that he informed Etienne that the S.6888 sponsors had taken
control over the bill negotiations, not that the bill could not
be amended or that CUP would stop advocating for S.6888.
(Richardson Decl. ¶ 41.)  Richardson's statement has some
support.  Williams, CUP's lobbyist, informed Richardson that he
should not directly lobby on behalf of S.6888, (see Williams
Dep. Tr. 165-67,) and Senator Hassel-Thompson testified that she
never authorized Richardson to negotiate with the OSC on behalf
of the bill sponsors, (see Hassel-Thompson Dep. Tr. 124-26.)
Even if Richardson's prediction was not entirely correct—that,
in fact, CUP could have influenced the bill sponsors—this
legislative prediction was not so disruptive that summary
judgment is appropriate on qualified immunity grounds.  See
Reuland, 460 F.3d at 414 ("In Pickering, . . . the Court found
that some of the statements at issue were false, but
nevertheless accorded those statements constitutional
protection, concluding that the employer's interest in
preventing the speech did not outweigh the employee's interest
in free speech.").

Although Etienne and Richardson now label this a "minor
consideration," they also claim that they found Richardson
untrustworthy because they believed that CUP, and thus
Richardson, failed to provide the S.6888 sponsors with the OSC's

30

June 2 revisions of the bill.  No reasonable official would find
Richardson unprofessional on this basis.  Both of the defendants
admit that they did not personally investigate or direct the OSC
staff to inquire as to whether CUP or Richardson failed to pass
on the OSC's revisions.  (Etienne Dep. Tr. 163-65; Pratcher Dep.
Tr. 222-25.)  And a reasonable factfinder could readily conclude
that the S.6888 sponsors received a copy of the OSC's revisions
from CUP; they simply did not consider those revisions a
compromise. (See Hassell-Thompson Dep. Tr. 118 (noting receipt
of the OSC's revisions), 135 (explaining that the OSC's June 2
revisions were not a "compromise").)

The defendants also assert that under Waters v. Churchill,
511 U.S. 661 (1994), the relevant inquiry is not whether an
objectively reasonable official would believe that Richardson
acted disruptively.  Instead, if they reasonably believed their
version of the facts, and that version passes Pickering muster,
then they are entitled to summary judgment on qualified
immunity.

The defendants read Waters too broadly.  In Waters, a
supervisor received two conflicting versions of a plaintiff's
speech, one from the plaintiff and one from other employees; the
version reported by the plaintiff would have been protected
under the First Amendment while the version reported by the
other employees could have served as a permissible basis for the

plaintiff's discharge.  511 U.S. at 665–66, 679–80 (plurality
opinion).  Justice O'Connor, writing for a plurality of the
Court, wrote that when faced with conflicting accounts of an
employee's speech or conduct, courts should consider the
employee's actions as the terminating supervisor "reasonably
found them to be."  Id. at 677; see also id. at 686 (Souter, J.,
concurring) ("Though Justice O'Connor's opinion speaks for just
four Members of the Court, the reasonableness test it sets out
is clearly the one that lower courts should apply.").  Whether
an employer's belief was reasonable, in turn, hinges on whether
the employer conducted a reasonable investigation to determine
what the terminated employee actually said.  Id. at 677
(plurality opinion).

Nothing in Waters, nor any case cited by the defendants,
suggests that when the disputed conversation was between an
employer who took the adverse action and an employee who spoke,
the Court should defer to the employer's version as long as that
version seems "reasonable."  See, e.g., Piscottano v. Murphy,
511 F.3d 247, 277 (2d Cir. 2007) (finding the Connecticut
Department of Corrections' fear of disruption reasonable when
"experts in prison administration and/or the problems of gang
violence[] amply described threats to safety, potentials for
disruption, potential conflicts of interest, and interference
with the integrity of DOC's operations"); Washington v. Nat'l

32

R.R. Passenger Corp., No. 01cv4201, 2003 WL 22126544, at *6
(S.D.N.Y. Sept. 12, 2003) (deferring to a hearing officer's
reasonable interpretation of an altercation).

The Court in Waters sought to protect public employers who
must determine, without first-hand knowledge, what an employee
actually said.  See Waters, 511 U.S. at 676 ("But employers,
public and private, often do rely on hearsay, on past similar
conduct, on their personal knowledge of people's credibility,
and on other factors that the judicial process ignores."); see
also Johnson v. Louisiana, 369 F.3d 826, 832 (5th Cir. 2004)
("The Court's reasoning in Waters was based largely on its
concern that government employers not be bound by strict
evidentiary rules when making employment decisions.").  Waters
did not hold that an employer can be the sole witness, judge,
and jury in a First Amendment retaliation case.  When there is a
dispute between an employer and an employee about what was
actually said in a conversation between the two, that creates an
issue of material fact, and a court is not required to defer to
what the employer says actually occurred.  Therefore, the Court
cannot accept as true the defendants' accounts of their June 10
conversations with Richardson on their summary judgment motions.

### C.

The defendants argue that even if Richardson's speech,
petition, and association were protected, no objectively

33

reasonable official would consider their responses adverse actions.

In order to sustain a First Amendment violation, the plaintiff must establish that the defendants took an adverse action against the plaintiff on the basis of his speech.  See Kuck v. Danaher, 600 F.3d 159, 168 (2d Cir. 2010).  Here, the defendants correctly note that they spoke to Woods only after he requested a meeting.  And in speaking to Woods, Richardson and Etienne insist that they simply exercised their First Amendment rights.

However, when read in the light most favorable to Richardson, Pratcher's and Etienne's statements to Woods indicated that that the OSC (one of ICV's largest clients) would stop investing in ICV if Richardson remained at the firm.  Woods testified that Pratcher spoke to him about the "series of issues" that he and Richardson were having about S.6888 and stated that it would be "tough for us to do business" with a company that "has somebody like [Richardson] on his team." (Woods Arb. Dep. Tr. 326, 372; Woods Decl. ¶ 7.)  Woods attested that Etienne expressed displeasure that Richardson had "been involved in all of [these] lobbying efforts and not—and doing this job—and [Woods] didn't do anything about it?"  (Woods Arb. Dep. Tr. 332.)  And, according to Woods, Etienne was perplexed that Richardson "[c]ould have been involved in an activity . . .

against one of [ICV's] largest investors." (Woods Arb. Dep. Tr. 332-33.) A reasonable factfinder could find that the reasonably foreseeable outcome of these statements was that ICV would terminate or seriously curtail the plaintiff's participation in ICV—the choice he was eventually given. This was in fact the understanding between the plaintiff and Woods when the plaintiff asked Woods if the OSC would invest in ICV funds if the plaintiff remained at ICV, and Woods responded that there was "no way to know" and "they certainly are not going to agree to that." (Richardson Decl. Ex. 4.)

The cases cited by the defendants are not to the contrary. Velez v. Levy, 401 F.3d 75 (2d Cir. 2005), for example, held that legislators do not retaliate against a contractor's protected speech "by voicing their political opinions, rather than exercising some sort of legal authority." Id. at 99 (citing X-Men Sec., Inc. v. Pataki, 196 F.3d 56 (2d Cir. 1999)). And Mezibov v. Allen, 411 F.3d 712 (6th Cir. 2005), stands for the unremarkable principle that a public official can respond to criticism levied against him without facing § 1983 liability. Id. at 722.

Unlike Velez and Meziboy, there is a factual dispute here as to whether or not the defendants threatened to take action against the plaintiff's employer because of the plaintiff's actions in connection with S.6888. That is, they "reasonably

35

[could] be interpreted as intimating that some form of punishment or adverse regulatory action will follow." Hammerhead Enters., Inc. v. Brezenoff, 707 F.2d 33, 39 (2d Cir. 1983); see also Okwedy v. Molinari, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam) ("A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form.").

## D.

Moreover, summary judgment on qualified immunity grounds is not appropriate if the plaintiff adduces sufficient evidence showing that the defendant retaliated against the plaintiff because of the content of the plaintiff's protected activities, rather than because the defendant reasonably feared disruption. Mandell, 316 F.3dat 385.  In other words, it is never objectively reasonable to act with a retaliatory intent, regardless of which direction Pickering balancing tips.  Indeed, in Waters, without reaching the qualified immunity issue, the Supreme Court found that summary judgment dismissing an employee's complaint was improper because there were issues of facts as to whether the employer fired the plaintiff not because

of the disruptive speech, but because of the protected speech.
511 U.S. at 681-82.

A genuine dispute exists as to whether the defendants acted
with a retaliatory motive.  Both defendants expressed
displeasure with Richardson's lobbying activity when they spoke
to Woods, not merely with his allegedly rude conduct.  Although
both statements *could* be interpreted as merely providing Woods
background for the disputed June 10 conversations, the Court
cannot conclude as a matter of law that the statements do not
show that the defendants said what they said because of
Richardson's protected activity.

III.

The defendants contend, qualified immunity aside, that
Richardson failed to present sufficient evidence to support his
First Amendment retaliation claims.  To survive a motion for
summary judgment, the plaintiff must present evidence which
shows that the speech or activity was protected, that he
suffered an adverse action, and that there was a causal
connection between the protected activity and the adverse
action.  See Cotarelo v. Vill. of Sleepy Hollow Police Dep't,
460 F.3d 247, 251 (2d Cir. 2006).  The plaintiff must also show
that the defendants' actions were a proximate cause of his
injuries.  Gierlinger v. Gleason, 160 F.3d 858, 872 (2d Cir.
1998).  A number of the defendants' arguments here are

37

repetitive with those made in connection with the defendants'
qualified immunity argument.

**A.**

The defendants dispute that they took adverse actions
against Richardson.  As discussed above, a fair reading of the
defendants' statements to Woods indicated that the OSC would not
invest with ICV as result of Richardson's conduct.  And those
statements could "reasonably be interpreted as intimating" that
ICV would face negative consequences if Richardson remained at
ICV.  Brezenoff, 707 F.2d at 39.

Moreover, neither Pratcher nor Etienne has carried the
burden of showing that they would have taken adverse actions
even absent a retaliatory animus.  "[A] defendant can rebut a
prima facie showing of retaliation by demonstrating 'by a
preponderance of the evidence that it would have taken the same
adverse employment action even in the absence of the protected
conduct.'"  Nagle v. Marron, 663 F.3d 100, 111–12 (2d Cir. 2011)
(quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)).
Here, the defendants argue that they spoke to Woods *only* because
they were offended during the June 10 conversations.  If, as the
plaintiff claims, those conversations were polite and about
S.6888, then the defendants retaliated solely on the basis of
the plaintiff's First Amendment activities.

The defendants assert that they spoke negatively about Richardson and suggested that the OSC would not invest in ICV funds because of Richardson's demeanor, not because he was a proponent of S.6888.  This assumes that the defendants' versions of their conversations with Richardson are true.  As explained above, a reasonable juror could accept Richardson's account, in which case the defendants would have retaliated in response to Richardson's First Amendment activities.  "Thus, the question of whether [defendants'] acts were retaliatory or justified 'runs to matters of credibility and weight of the evidence, which are matters for the jury.'  The Court need not reconcile the parties' incompatible stories at the summary judgment stage." Rhoomes, 2010 WL 3825728, at *7 (internal citation omitted) (quoting Graham v. Henderson, 89 F.3d 75, 81 (2d Cir. 1996)).

Etienne correctly explains that Richardson has failed to show that she played any role in the OSC's decision not to invest in ICV Growth.  Richardson offers no evidence, direct or circumstantial, that Etienne was ever consulted about or made a decision concerning whether the CRF should invest in ICV Growth. (See Etienne Decl. ¶ 21.)  "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) (internal quotation

marks omitted) (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).  However, Etienne's lack of involvement in the OSC's decision not to invest in ICV Growth would not exonerate her for potential liability from the adverse action involved in Richardson's termination.

Pratcher, on the other hand, admits that he put a "hold" on ICV Growth because he "wanted to consider Richardson's conduct" during the June 10 conversation.  (Pratcher Decl. ¶ 39.)  But Richardson disputes that he acted in an inappropriate manner during the June 10 conversation, and if he politely lobbied for S.6888, then Pratcher prevented the CRF from investing in ICV Growth based on the plaintiff's protected speech and conduct. And even if the Court credits Pratcher's assertion that he also was concerned with the financial aspects of ICV Growth, neither his declaration nor his deposition testimony suggests that he "would have taken exactly the same action absent the improper motive."  Scott v. Coughlin, 344 F.3d 282, 288 (2d Cir. 2003).

**B.**

The defendants next argue that they did not proximately cause Richardson's injuries.  The Supreme Court has made clear that "not every injury in which a state official has played some part is actionable under [§ 1983]." Martinez v. California, 444 U.S. 277, 285 (1980).  The "plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's

40

injury." Gleason, 160 F.3d at 872.  Those sued under § 1983 are responsible for the natural "consequences of their actions, including consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." Kerman v. City of New York, 374 F.3d 93, 126 (2d Cir. 2004) (quoting Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1996)).  Generally, an intentional intervening act severs the liability of a defendant.  However, a reasonably foreseeable independent decision that harms the victim does not break the chain of causation.  See Zahrey v. Coffey, 221 F.3d 342, 351–54 (2d Cir. 2000); see also Higazy v. Templeton, 505 F.3d 161, 177 (2d Cir. 2007) (holding, in a Bivens action, that a tortfeasor is liable for the consequences caused by reasonably foreseeable intervening forces).

Here, one of the injuries alleged—the plaintiff's termination—was "ultimately" caused by Woods, not the defendants.  Thus, the defendants argue that Woods's decision to fire Richardson, and Richardson's decision to "accept" his termination, are superseding causes.  For the claim that Pratcher retaliated by placing ICV Growth on hold, the defendants argue that Woods's decision to cease fundraising was a superseding cause.

**1.**

The defendants maintain that they could not reasonably foresee that their conversations with Woods would result in Richardson's termination.  They note that in his declaration, Woods insists that neither Etienne nor Pratcher stated that Richardson should be fired, (Woods Decl. ¶¶ 7, 10,) that they were not aware that Richardson was an at-will employee, (Woods Dep. Tr. 115; Etienne Decl. ¶ 41; Pratcher Decl. ¶ 52,) and that they had no intention of breaking up ICV, (Etienne Decl. ¶ 19; Pratcher Decl. ¶ 54.)

Woods's decision does not, as a matter of law, break the chain of causation.  Interpreting the evidence in the light most favorable to the plaintiff, Etienne and Pratcher reprimanded Woods for allowing Richardson to advocate for legislation that would be detrimental to the OSC.  And, although Woods declared that neither defendant requested that he fire Richardson, when explaining why he presented Richardson with two adverse employment options, Woods insisted that Richardson had upset the OSC, one of ICV's largest investors.  (Richardson Decl. Ex. 4.) Indeed, Woods testified that he was angry with Richardson because of "the feedback from New York State Common . . . on these outside activities" and because of CUP's recent actions. (Woods Arb. Dep. Tr. 363-66.)  Woods only discussed the possibility of terminating Richardson with ICV's investment

42

partners after he learned about Richardson's dispute with
Etienne and Pratcher.  (Woods Arb. Dep. Tr. 345-62.)

For the proximate cause inquiry, the relevant question is
whether a rational factfinder could find that the defendants
could reasonably foresee that ICV would terminate or demote
Richardson.  See Tsesarskaya v. City of New York, 843 F. Supp.
2d 446, 460 (S.D.N.Y. 2012) (noting that foreseeability is
normally a question of fact for the jury).  Here, the defendants
represented the OSC, one of ICV's largest investors, and
allegedly stated that Richardson's lobbying activities put
future investments at risk.  Although the defendants provided
evidence showing an already strained relationship between ICV
and Richardson, neither plausibly argues that ICV seriously had
considered terminating Richardson before Woods heard about the
June 10 conversations.  (See Woods Arb. Dep. Tr. 208-09.)

**2.**

The defendants also contend that Richardson's "request" to
be terminated is a superseding cause.  Woods provided Richardson
with two options, either (a) relinquish his shares in ICV,
restrict communications with investors, and resign from CUP, or
(b) face termination.  (Richardson Decl. Ex. 3.)  Richardson
refused the forced choice and was terminated.  Regardless of
which option Richardson selected, he would have suffered a
cognizable injury.  See Zelnik v. Fashion Inst. of Tech., 464

43

F.3d 217, 226 (2d Cir. 2006) (listing "discharge, refusal to
hire, refusal to promote, demotion, reduction in pay, and
reprimand" as adverse actions in the context of a First
Amendment retaliation claim (internal quotation marks omitted)
(quoting Morris, 196 F.3d at 110)); cf. Burlington N. & Santa Fe
Ry. Co. v. White, 548 U.S. 53, 68 (2006) (holding that Title
VII's anti-retaliation provision prohibits any action that
"might have dissuaded a reasonable worker from making or
supporting a charge of discrimination").  Thus, whichever option
Richardson chose, he was faced with a sufficiently serious
injury.

3.

Pratcher does not dispute that he decided the OSC should
not invest in ICV Growth.  For this alleged adverse action,
there is no independent action that Pratcher needed to foresee.
But the defendants argue (a) that Woods, not Pratcher, decided
to suspend fundraising on ICV Growth, and (b) that Pratcher
placed the OSC's investment on "hold" at a preliminary stage of
the investment process—there was no guarantee that the OSC would
have decided to invest.

Both issues require factual resolution.  Woods's testimony
indicates that he decided to stop fundraising for ICV Growth
after it became apparent that Pratcher and Etienne were upset
with ICV.  (Woods Arb. Dep. Tr. 516; Woods Dep. Tr. 368-72.)

44

And Pratcher does not argue that the OSC certainly would not have invested in ICV Growth, regardless of their conversations with the plaintiff.  Pratcher instead insists that other OSC staff members independently would have reviewed ICV Growth, despite Bank of America's initial recommendation.  Both issues— whether Woods would have ceased fundraising for ICV Growth even if the OSC had invested, and whether the OSC would have invested in ICV Growth had Pratcher not "held" the investment—require factual resolution not appropriate at the summary judgment stage.

Accordingly, the defendants' motion for summary judgment dismissing Counts One, Three, and Five, the First Amendment claims under § 1983, is **denied.**

### IV.

Richardson also claims that the defendants violated his rights of speech, assembly, and petition under article I, sections 8 and 9 of the New York Constitution.  At oral argument, the plaintiff agreed to withdraw his State Constitution claims if the § 1983 claims survived summary judgment.

Accordingly, the defendants' motion for summary judgment dismissing Counts Two, Four, and Six, the claims asserted under the New York State Constitution, is **granted.**

45

**V.**

Richardson alleges that the defendants tortiously interfered with the ICV partnership contracts.  To establish a claim for intentional interference with contract under New York law, the plaintiff must show: (1) "the existence of its valid contract with a third party"; (2) the "defendant's knowledge of that contract"; (3) the "defendant's intentional and improper procuring of a breach"; and (4) resulting damages.  White Plains Coat & Apron Co. v. Cintas Corp., 867 N.E.2d 381, 383 (N.Y. 2007).

Richardson identified ICV partnership agreements.  However, Richardson failed to show that Etienne or Pratcher were aware of any of these agreements.  The defendants' knowledge of a contract need not be perfect, and the defendants may be "totally unaware of, and customarily indifferent to, the legal particulars of that contract (as distinguished, perhaps, from its economic or operational aspects)."  Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 406 N.E.2d 445, 450 (N.Y. 1980). Nonetheless, the defendant "must have actual knowledge of a specific contract."  Medtech Prods. Inc. v. Ranir, LLC, 596 F. Supp. 2d 778, 813 (S.D.N.Y. 2008) (internal quotation marks omitted) (quoting Int'l Minerals & Res., Inc. v. Pappas, No. 87cv3988, 1992 WL 354504, at *3 (S.D.N.Y. Nov. 17, 1992)).

Pratcher and Etienne declared that they had no knowledge of ICV's employment structure, let alone of the existence of the particular partnership agreements identified in the complaint. (Etienne Reply Decl. ¶ 2; Pratcher Reply Decl. ¶ 2.)  Woods's testimony substantiates their claim.  He testified that Pratcher was surprised when he was informed that Woods was the managing partner of ICV.  (Woods Dep. Tr. 115-19.)  The only evidence cited to the contrary comes from Richardson's declaration, where he stated: "This ownership structure, my employment status and my equity and carried interest were all disclosed to the OSC which, as an investor, received all of the firm's governing documents and contracts."  (Richardson Decl. ¶ 8.)

At best, Richardson has established that because the OSC had a copy of the various partnership agreements, the defendants should have known of these agreements.  That is insufficient to show that either defendant had *actual* knowledge of the various partnership agreements.  "As an essential element of the cause of action sought to be pleaded the plaintiff must allege that the defendants had actual knowledge; an allegation that they 'should have known' of the existence of the contract is insufficient."  A A Tube Testing Co. v. Sohne, 246 N.Y.S.2d 247, 248 (App. Div. 1964); see also Ferring B.V. v. Allergan, Inc., No. 12cv2650, --- F. Supp. 2d. ---, 2014 WL 988595, at *10 (S.D.N.Y. Mar. 13, 2014) ("'[A]ctual notice' is required, and

'allegations of constructive knowledge, or a duty to inquire, are inadequate to constitute an enforceable claim.'" (quoting Business Lenders, LLC v. PKR Stores, LLC, No. 055/66, slip op. at 9 (N.Y. Sup. Ct. Sept. 28, 2010))); LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 496 (S.D.N.Y. 2002) (rejecting the plaintiffs' contention that the defendants had actual knowledge because the agreements in dispute "were 'a matter of course' and 'common practice'").  Because Richardson failed to identify any evidence suggesting that either Etienne or Pratcher knew of his partnership agreements, his claim fails.

Accordingly, the defendants' motion for summary judgment dismissing Count Seven, the tortious interference with contract claim, is **granted**.

## VI.

Richardson finally alleges that the defendants tortiously interfered with various prospective business relations.  "A claim for tortious interference with a prospective business relationship (i.e., an economic advantage) must allege: (1) the defendant's knowledge of a business relationship between the plaintiff and a third party; (2) the defendant's intentional interference with the relationship; (3) that the defendant acted by the use of wrongful means or with the sole purpose of malice; and (4) resulting injury to the business relationship."  534 E.

11th St. Hous. Dev. Fund Corp. v. Hendrick, 935 N.Y.S.2d 23, 24
(App. Div. 2011).

Richardson's claim here is less than clear.  To the extent
he alleges that the defendants interfered with the existing
partnership agreements with ICV, this claim restates the
interference with contract claim.

If Richardson is arguing that the defendants interfered
with ICV Fund III, he provided no evidence that either Pratcher
or Etienne knew of the existence of that fund when they spoke
with Woods.  See Burns Jackson Miller Summit & Spitzer v.
Lindner, 452 N.Y.S.2d 80, 93 (App. Div. 1982) (holding that
"even in its most liberal formulation, the [prospective]
relationships must be specified, as must the defendants'
knowledge and the interference."), aff'd, 451 N.E.2d 459 (N.Y.
1983).  The only evidence of the defendants' knowledge is from
Pratcher's declaration, where he states that he became aware of
ICV Fund III's existence after he left the Emerging Managers
Program office, and the OSC eventually approved an investment in
ICV Fund III after Richardson left ICV.  (Pratcher Decl. ¶ 19.)

However, Richardson provided sufficient evidence to show
that Pratcher interfered with the OSC's potential investment in
ICV Growth.  Pratcher responds with three arguments.  First, he
claims there is no evidence showing that he intended to
interfere with ICV Growth.  But Pratcher admits that he put a

"hold" on ICV Growth because he "wanted to consider Richardson's conduct" during the June 10 conversation.  (Pratcher Decl. ¶ 39.)  Second, Pratcher claims there is no evidence that he acted with malice.  It is sufficient for a plaintiff to show that a defendant "engaged in conduct for the sole purpose of inflicting intentional harm on the [plaintiff]."  <u>Carnival Corp. v. Noonan</u>, 818 N.E.2d 1100, 1103 (N.Y. 2004). In this case there is an issue of fact as to whether Pratcher halted CRF's investment for the sole purpose of retaliating against, and therefore harming, Richardson.  Third, Pratcher argues that Richardson failed to show that the OSC would have invested in ICV Growth but for Pratcher's allegedly wrongful conduct.  However, there is an issue of material fact as to whether the OSC ultimately would have decided to invest in ICV Growth had Pratcher not placed negotiations on hold.  On the other hand, as to Etienne, there is no evidence suggesting that she played any role in the OSC's decision not to invest in ICV Growth.

Accordingly, Etienne's motion for summary judgment dismissing Count Eight, the tortious interference with business relations claim, is **granted**.  Pratcher's motion to dismiss Count Eight is **denied**.

### VII.

The defendants move to strike content from the plaintiff's response to the defendants' statement of material facts.

Specifically, the defendants argue that the plaintiff cites inadmissible and nonresponsive evidence, and Richardson's declaration contains inadmissible hearsay.  The Court only considered the portions of the defendants' response and Richardson's declaration that are well founded.  Therefore, the motion to strike is **denied** as moot.

CONCLUSION

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed above, they are either moot or without merit.  The defendants' motion for summary judgment is **granted in part and denied in part.**  The defendants' motion to strike is **denied** as moot.  The Clerk is directed to close **Docket Nos**. **27** and **61.**

SO ORDERED.

Dated:   New York, New York
         September 27, 2014                   _____/s/_____
                                                   John G. Koeltl
                                             United States District Judge