UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| TARRUS L. RICHARDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| - against - | ) | 12-cv-08451-JGK |
| | ) | |
| TYSON PRATCHER and RAUDLINE ETIENNE, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE,
TO CLARIFY THE AMOUNT OF THE JUDGMENT AND FOR A NEW TRIAL**

# TABLE OF CONTENTS

**Page**

Preliminary Statement.................................................................................................1

ARGUMENT...................................................................................................................4

    I.     DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY. ...........................4

    II.    PLAINTIFF'S CONDUCT WAS NOT PROTECTED UNDER *PICKERING.*..........15

    III.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, A NEW TRIAL, BECAUSE THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUPPORT LIABILITY UNDER § 1983. ....21

         A.    The Applicable Legal Standards. .......................................................................21

         B.    There Was Insufficient Evidence for A Reasonable Jury To Find That Defendants Took Adverse Action Against Plaintiff. ...........................................22

         C.    No Reasonable Jury, Properly Instructed, Could Find That Defendants Retaliated Against Richardson Because of an Improper Motive......................27

             1.    The Court's Instructions Were Erroneous.................................................28

             2.    The Evidence Showed That Defendants Did Not Have Retaliatory Intent...........................................................................................................33

         D.    Defendants Are Entitled to Judgment as a Matter of Law Under *Mt. Healthy*...37

         E.    No Reasonable Jury Could Find That Defendants Proximately Caused Any Injury to Plaintiff...................................................................................................39

    IV.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE AMOUNT OF DAMAGES, OR, IN THE ALTERNATIVE, TO A REMITTUR OR A NEW TRIAL ...............................................................................................42

         A.    Plaintiff Is Not Entitled To A Double Recovery. .............................................43

         B.    The Damages Award Should Be Reduced Because It Is Excessive. ..................47

CONCLUSION...............................................................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amore v. Novarro*,
   624 F.3d 522 (2d Cir. 2010)...............................................................................5, 6

*Anderson v. Creighton*,
   483 U.S. 635 (1987)..............................................................................................6

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................21

*Anemone v. Metro. Transp. Auth.*,
   629 F.3d 97 (2d Cir. 2011)................................................................15, 28, 30

*Ashcroft v. Al-Kidd*,
   131 S. Ct. 2074 (2011)..........................................................................................5

*Bailey v. Dep't of Elementary & Secondary Educ.*,
   451 F.3d 514 (8th Cir. 2006) ............................................................................16

*Bd. of County Cmm'rs v. Umbehr*,
   518 U.S. 668 (1996)..........................................................................2, 9, 15, 33

*Bender v. City of New York*,
   78 F.3d 787 (2d Cir. 1996)................................................................43, 44, 47

*Bosco v. Serhant*,
   836 F.2d 271 (7th Cir. 1987) ......................................................................43, 44

*Boylan v. Arruda*,
   42 F. Supp. 2d 352 (S.D.N.Y. 1999)................................................................23

*Castine v. Zurlo*,
   756 F.3d 171 (2d Cir. 2014)..............................................................................15

*City & Cnty. of San Francisco v. Sheehan*,
   135 S. Ct. 1765 (2015)..................................................................................5, 6, 9

*Conn. ex rel. Blumenthal v. Crotty*,
   346 F.3d 84 (2d Cir. 2003)...................................................................................5

*Deskovic v. Peekskill*,
   673 F. Supp. 2d 154 (S.D.N.Y. 2009)..............................................................39

*DLC Mgmt. Corp. v. Town of Hyde Park,*
    163 F.3d 124 (2d Cir. 1998)........................................................................22

*Donninger v. Niehoff,*
    642 F.3d 334 (2d Cir. 2011)....................................................................6, 7

*Elion v. Jackson,*
    544 F. Supp. 2d 1 (D.D.C. 2008) ..............................................................36

*Emerson v. City of New York,*
    740 F. Supp. 2d 385 (S.D.N.Y. 2010)..........................................................6

*Fahs Constr. Grp., Inc. v. Gray,*
    725 F.3d 289 (2d Cir. 2013) (*per curiam*) ..................................................9

*Finn v. N.Y. State Off. of Mental Health-Rockland Psychiatric Ctr.,*
    489 F. App'x 513 (2d Cir. 2012) ...............................................................16

*Frank Sloup & Crabs Unlimited, LLC v. Loeffler,*
    745 F. Supp. 2d 115 (E.D.N.Y. 2010) .......................................................48

*Germann v. City of Kansas City,*
    776 F.2d 761 (8th Cir. 1985) ....................................................................16

*Giacalone v. Abrams,*
    850 F.2d 79 (2d Cir. 1988)...................................................................7, 16

*Gierlinder v. Gleason,*
    160 F.3d 858 (2d Cir. 1998).....................................................................39

*Goldhirsh Grp., Inc. v. Alpert,*
    107 F.3d 105 (2d Cir. 1997)................................................................21, 22

*Greenwich Citizens Comm., Inc. v. Cntys. of Warren & Washington Indus. Dev. Agency,*
    77 F.3d 26 (2d Cir. 1996)................................................................. passim

*Heil v. Santoro,*
    147 F.3d 103 (2d Cir. 1998)..........................................................23, 25, 33

*Higazy v. Templeton,*
    505 F.3d 161 (2d Cir. 2007).....................................................................39

*Hous. Works, Inc. v. Turner,*
    179 F. Supp. 2d 177 (S.D.N.Y. 2001).........................................................9

*Hoyt v. Andreucci,*
    433 F.3d 320 (2d Cir. 2006)......................................................................22

*Iannillo v. Cnty. of Orange*,
    187 F. Supp. 2d 170 (S.D.N.Y. 2002) ...................................................................16

*Lennon v. Miller*,
    66 F.3d 416 (2d Cir. 1995) ..............................................................................6

*Lewis v. Cowen*,
    165 F.3d 154 (2d Cir. 1999) ..........................................................15, 16, 17, 32

*Mallett v. Town of Plainville*,
    No. 3:01 CV 1137 (AHN), 2006 WL 931712 (D. Conn. Apr. 4, 2006) ................................23

*Michelman v. Clark–Schwebel Fiber Glass Corp.*,
    534 F.2d 1036 (2d Cir. 1976) ..........................................................................22

*Moran v. State of Wash.*,
    147 F.3d 839 (9th Cir. 1998) ............................................................................7

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977) ........................................................................... passim

*Murray v. Town of N. Hempstead*,
    853 F. Supp. 2d 247 (E.D.N.Y. 2012) ..................................................................23

*O'Hare Truck Serv., Inc. v. City of Northlake*,
    518 U.S. 712 (1996) ......................................................................................9

*Otte v. Brusinski*,
    440 F. App'x 5 (2d Cir. 2011) ......................................................................23, 24, 26

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ......................................................................................6

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968) ........................................................................... passim

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ................................................................................15, 16

*Rao v. N. Y. City Health & Hosps. Corp.*,
    882 F. Supp. 321 (S.D.N.Y. 1995) ....................................................................48

*Reichle v. Howards*,
    132 S. Ct. 2088 (2012) ....................................................................................1

*Rivera v. Baccarat, Inc.*,
    34 F. Supp. 2d 870 (S.D.N.Y. 1999) ..................................................................47

*Rodick v. City of Schenectady*,
  1 F.3d 1341 (2d Cir. 1993)................................................................................43, 46

*Sagendorf-Teal v. Cnty. of Rensselaer*,
  100 F.3d 270 (2d Cir. 1996)..............................................................................47

*Scott v. Coughlin*,
  344 F.3d 282 (2d Cir. 2003)............................................................................23, 28

*Simblest v. Maynard*,
  427 F.2d 1 (2d Cir. 1970)..................................................................................21

*Spavone v. N.Y. State Dep't of Corr. Servs.*,
  719 F.3d 127 (2d Cir. 2013)..............................................................................6

*Stephenson v. Doe*,
  332 F.3d 68 (2d Cir. 2003)................................................................................4

*Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark*,
  39 F.3d 812 (7th Cir. 1994) ..............................................................................43

*Waters v. Churchill*,
  511 U.S. 661 (1994)................................................................................16, 23, 33

*Zellner v. Summerlin*,
  494 F.3d 344 (2d Cir. 2007)..............................................................................4

## STATUTES

28 U.S.C. § 1983 ............................................................................... passim

## FEDERAL RULES

Fed. R. Civ. P. 50 ...............................................................................1, 21, 22, 50

Fed. R. Civ. P. 56 ...............................................................................21

Fed. R. Civ. P. 59 ...............................................................................1, 3, 20, 22, 50

## OTHER AUTHORITIES

9B Charles A. Wright & Arthur A. Miller, *Fed. Prac. & Proc. Civ.* § 2524 (3d ed. 2004)..........21

*Prosser & Keeton on the Law of Torts*, § 47 ..............................................................44

Defendants Tyson Pratcher ("Pratcher") and Raudline Etienne ("Etienne") (together, "Defendants") respectfully submit this memorandum of law in support of their renewed motion for judgment as a matter of law or, in the alternative, to clarify the amount of the judgment and for a new trial, pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure.

## Preliminary Statement[1]

Defendants' motion for judgment as a matter of law is based on several independent grounds.  First, the evidence at trial establishes that Defendants are entitled to qualified immunity as a matter of law.  No existing precedent gave Defendants fair notice that their actions (1) for Pratcher, taking additional time to consider the ICV Growth proposal; and (2) for both Defendants, speaking to Willie Woods, at his request, about their concerns regarding the behavior of Plaintiff Tarrus Richardson ("Plaintiff" or "Richardson") would violate Richardson's rights.  Their actions were reasonable and appropriate in the context of the ongoing relationship and partnership between the OSC and ICV,[2] and there is no basis for saying that every competent state employee in their position would have understood that their conduct was unlawful.  *See Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) ("To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." (citation and quotation omitted)).  This is an issue of law for the Court, and is

---

[1] Most of the materials cited in this motion have been previously filed in this case and are available on the Court's docket.  Relevant excerpts of trial testimony, cited trial exhibits and other documents not available on the docket are included as Exhibits to the Declaration of Ira M. Feinberg, dated June 5, 2015 (the "Feinberg Decl."), filed herewith.

[2] All abbreviations, acronyms and shorthand references used in this memorandum will be consistent with the parties' usage throughout the trial and in prior briefing.

not dependent on the jury's verdict.  To the extent that the jury's verdict purports to find that Defendants were retaliating against Richardson because of his exercise of his First Amendment rights, the jury's determination is based on erroneous jury instructions, which failed to require the jury to focus on the crucial distinction between Defendants' retaliating because of Plaintiff's First Amendment activities versus the Defendants' taking actions in response to the conduct of Plaintiff in the course of his conversations with them regarding those activities.

Second, Defendants are entitled to judgment as a matter of law because Plaintiff's conduct in his interactions with them was not protected by the First Amendment.  As a government contractor, Richardson's unprofessional conduct was protected only if Defendants' belief that it would likely interfere with his ability to work for the state was unreasonable. *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Bd. of County Cmm'rs v. Umbehr*, 518 U.S. 668, 677-78 (1996).  The evidence at trial was overwhelming that Defendants had legitimate concerns about Plaintiff's behavior, which they found rude, disrespectful, and unprofessional, and which Defendants reasonably believed jeopardized the OSC's trust and confidence in ICV and threatened to disrupt their close working relationship and partnership with ICV.  Plaintiff presented no evidence which called into question the reality and validity of Defendants' concerns.  This is also a question for law for the Court.  To the extent that the special interrogatories answered by the jury purport to find that Defendants' concerns were not reasonable, the questions posed by the Court are far too general to be useful in determining what facts the jury found, and the jury's ultimate conclusion is not supported by the evidence at trial.

Third, the Court should grant judgment as a matter of law, because, for several reasons, no reasonable jury could conclude from the evidence at trial that Plaintiff is entitled to relief under 28 U.S.C. § 1983.  To begin, Plaintiff did not show that Defendants' actions qualify as

adverse actions under the law.  Furthermore, properly instructed, no reasonable jury could find that Plaintiff satisfied his burden to prove that either Defendant acted with a motive to retaliate against him for his First Amendment activities.  Next, even if the Defendants were allegedly motivated in part by a desire to retaliate for Plaintiff's First Amendment activities, the evidence overwhelmingly established that Defendants would have taken the same limited actions, in any event, in response to Richardson's conduct vis-à-vis them—and accordingly, that Defendants actions are protected under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)—and that no reasonable, properly instructed jury could have concluded otherwise.  In addition, no reasonable jury could find that Pratcher's June 17 email suggesting a discussion before going forward with ICV Growth caused the OSC not to invest in ICV Growth or that the ICV Growth fund would have materialized even if the OSC had agreed to invest in it.  Finally, no reasonable jury could conclude that Defendants' limited actions in this case proximately caused Plaintiff's alleged injuries resulting from his termination from ICV, because Plaintiff's departure from ICV was not a foreseeable consequence of Defendants' discussions with Woods.

Alternatively, the jury's verdict on these issues is against the clear weight of the evidence.  Even if the Court concludes that it cannot grant Defendants judgment as a matter of law, the Court should exercise its discretion to grant Defendants a new trial under Rule 59.

Defendants also raise substantial issues regarding the amount of the jury's verdict.  The jury's Special Verdict Form indicated that Defendant Pratcher was responsible for $10,864,479 in compensatory damages and that Defendant Etienne was responsible for $7,242,986 in damages.  Plaintiff claims that under the jury's verdict, he is entitled to recover the *sum* of these two figures, for a total of approximately $18.1 million in damages.  This interpretation of the jury's verdict is incorrect.  As Plaintiff conceded during the Charge Conference, Plaintiff has

- 3 -

alleged only a single injury arising from Defendants' conduct, and there is no factual basis to hold that Plaintiff is entitled to recover from Defendant Etienne an additional $7.2 million in damages beyond what Plaintiff may recover from Pratcher.  Plaintiff's position on this issue is inconsistent with the Court's jury instructions, and it would constitute an impermissible double recovery.   Accordingly, Defendants respectfully request that, if the Court does not grant Defendants' motions for judgment as a matter of law or for a new trial, the Court should make clear in the judgment that Plaintiff is entitled only to recover $10,864,479 in total—of which the whole may be recoverable against Defendant Pratcher and up to $7,242,986 may be recovered from Defendant Etienne.   Indeed, wholly apart from the erroneous position Plaintiff is taking regarding the amount of the judgment, any award in this case beyond the $10.8 million the jury awarded would be excessive, based on speculation, and impermissible, and Defendants ask that it be reduced by remittitur or, in the alternative, Defendants be granted a new trial.

## **ARGUMENT**

## I.      **DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

The Court should grant Defendants judgment as a matter of law because Defendants are entitled to qualified immunity.  Whether a defendant is protected by qualified immunity is a question of law for the Court to decide.  *Zellner v. Summerlin*, 494 F.3d 344, 367-68 (2d Cir. 2007) ("Once the jury has resolved any disputed facts that are material to the qualified immunity issue, . . . the ultimate determination of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right . . . is to be made by the court."); *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (approving procedure of using jury to decide disputed issues of fact via special interrogatories, provided that the court makes "the ultimate legal determination of whether qualified immunity attaches on those facts"); Opinion and Order, Sept. 29, 2013, Doc. No. 77 ("Op."), at 25.

There is a "presumption in favor of qualified immunity." *Conn. ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 104 (2d Cir. 2003). A state official enjoys qualified immunity from suits under Section 1983 unless it is shown "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citation omitted). Thus, officials are entitled to qualified immunity "if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known; or (2) it was objectively reasonable [for them] to believe that their acts did not violate these clearly established rights." *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010) (internal citation and quotation omitted) (citation omitted).

The Supreme Court recently reiterated the "exacting standard" required to overcome the defense of qualified immunity. *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015). There, the Court held that "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it,' meaning that 'existing precedent . . . placed the statutory or constitutional question beyond debate.'" *Id.* (internal citations omitted). The purpose of this "exacting standard" is to give "'government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (citation omitted).

Under this rule, merely asserting that a plaintiff has the right to be free from retaliation for his First Amendment activities is not sufficient to show that a defendant violated clearly established law. *See id.* at 1775-76. The Supreme Court has "repeatedly" told courts "not to define clearly established law at a high level of generality," because "[q]ualified immunity is no immunity at all if 'clearly established' law can simply be defined . . ." as a general right. *Id.* If

reviewing existing case law would not cause a state employee to know, in advance, that his or her conduct would violate the plaintiff's rights, it cannot be said that the state employee had "fair notice" that he or she was violating a "clearly established" right.  *See id.* at 1777.   And "[w]ithout that 'fair notice,' an officer is entitled to qualified immunity."  *Id.* (citation omitted).

Even if a right is clearly established, a state official is entitled to qualified immunity if it was objectively reasonable to believe that his or her acts did not violate that clearly established right, based on the information reasonably known to the defendant at the time.  *Amore*, 624 F.3d at 530.   "[D]etermining whether official conduct was objectively reasonable 'requires examination of the information possessed' by the officials at that time."  *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  It can be objectively reasonable for a defendant to believe that his or her acts did not violate clearly established rights even if that belief was mistaken—and this is so "whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013).   *See Donninger v. Niehoff*, 642 F.3d 334, 353-55 (2d Cir. 2011) (officials who prohibited students from wearing controversial T-shirt entitled to qualified immunity because their mistake in believing that it threatened substantial disruption was reasonable).   An official's actions are objectively unreasonable only when "no officer of reasonable competence could have made the same choice in similar circumstances."  *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995); *accord Emerson v. City of New York*, 740 F. Supp. 2d 385, 391 (S.D.N.Y. 2010).

In a case involving *Pickering* analysis, a government official will be entitled to qualified immunity so long as the balancing of the *Pickering* factors does not "so clearly" weigh in the plaintiff's favor that no reasonable government official could have believed that his or her

conduct did not violate the plaintiff's rights. *Giacalone v. Abrams*, 850 F.2d 79, 86 (2d Cir. 1988); *Doninger,* 642 F.3d at 353.[3]   Again, in making this determination, qualified immunity analysis "requires the court to consider the operation of the rule in the context of 'the circumstances with which [the official] was confronted.'"   *Giacalone*, 850 F.2d at 85.   "[T]he proper inquiry . . . is whether the law defined by *Pickering* and the cases following it was 'clearly established' . . . [such that defendants] could reasonably have anticipated that their conduct would violate [the plaintiff's] First Amendment rights."   *Id*. at 86.

Here, Defendants are entitled to qualified immunity because there is no basis for holding that every reasonable state official in their position would have recognized that their conduct would violate a clearly established right of Plaintiff, and because Defendants did not have fair notice based on existing case law that their conduct would violate his rights.   Regarding Plaintiff's claims about ICV Growth, the only evidence at trial was that Defendant Pratcher sent an email suggesting that the OSC should discuss the proposed investment before going forward with the legal stage of the proposed investment.   There was no evidence about what happened after that, and no evidence that could possibly support a jury determination that Pratcher was responsible for preventing the OSC from making this investment.   Plaintiff presented no evidence as to how sending this email could possibly be viewed as demonstrating conduct that no reasonable state official could have believed to be proper.

Similarly, as to Plaintiff's claims about Defendants' meetings with Willie Woods, there is no basis for holding that Defendants' agreement to meet with Woods, at his request, and to share

---

[3] *See also Moran v. State of Wash*., 147 F.3d 839, 847 (9th Cir. 1998) (since *Pickering* requires a case-by-case analysis, it rarely will be "clearly established" that a given conduct is unconstitutional).

with him their concerns about Plaintiff's conduct, was conduct that no reasonable state official could have believed to be lawful.  The evidence at trial established that Defendants had genuine and legitimate concerns about Plaintiff's conduct in his interactions with them; there is no basis in the evidence to support any argument that Defendants' concerns were manufactured or pretextual.  In this light, it is impossible to say that no reasonable state official could have thought it appropriate to meet with Plaintiff's partner, Woods, and discuss their concerns with him.  The evidence shows that Defendants agreed to these meetings – indeed, reluctantly – because they believed it was the <u>appropriate</u> thing to do, to meet with one of the principals of their partner investment firms when an issue had arisen in their relationship, and that they did so as part of an effort to clear the air and begin to repair their relationship with ICV (and ultimately, Richardson).  (Feinberg Decl., Ex. 5 (Excerpts of trial transcript (hereafter, "Tr.")), at 1096:22-1097:11, 1408:12-1411:13.)   Indeed, the evidence showed that Defendants had a fiduciary obligation to act on their concerns about Plaintiff's professionalism, judgment, candor, and decorum, as these qualities were essential prerequisites for an investment manager trusted to manage Common Retirement Fund investments.   (Tr. 1082:2-1083:8, 1086:7-22, 1394:7-1395:18.)   There is no existing precedent that indicated, much less clearly established, that Defendants were required to ignore their concerns about Richardson's behavior, simply because those concerns arose in the context of his First Amendment activities.  Similarly, ICV and the OSC were partners, literally, in ICV Fund II, and as a consequence ICV (and Richardson) owed fiduciary duties to the CRF.  (Tr. 1394:7-1395:25.)  No existing precedent holds that partners cannot speak to each other in an effort to address concerns relevant to that partnership and fiduciary relationship.

Indeed, none of the cases cited in the Court's summary judgment opinion in support of

the conclusion that Defendants may have violated a clearly established right, Op. at 19-20, would have put Defendants on notice that their actions were unlawful.  All of those decisions stand for the proposition that independent contractors have First Amendment rights, but they say nothing about what a state employee should do if he or she reasonably believes that the contractor's conduct during exercise of those rights raises concerns about the contractor's judgment, demeanor, integrity, or competence.  *See Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 291 (2d Cir. 2013) (*per curiam*) (noting that "independent contractors hired by the State are protected by the First Amendment," but making no finding as to qualified immunity and giving no indication what a government employee should do to investigate conduct by an independent contractor that raised questions about his competence); *Hous. Works, Inc. v. Turner*, 179 F. Supp. 2d 177, 188, 202 (S.D.N.Y. 2001) (holding that "any . . . official who expresses displeasure about any person's exercise of free speech rights and then manifestly subjects that person to adverse action must know that the First Amendment will be implicated," but doing so in a case where there was no relationship between the plaintiff's First Amendment activities and their job qualifications or performance, and the government argued that *Umbehr* did not apply at all); *Umbehr*, 518 U.S. at 677–78 (holding generally that independent contractors are protected from retaliation for protected speech); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 726 (1996) (declining, as a general matter, "to draw a line excluding independent contractors from the First Amendment safeguards of political association afforded to employees").  Under *Sheehan*, this means that Defendant did not have "fair notice" that their actions were unlawful, and they are therefore entitled to qualified immunity.  135 S. Ct. at 1777.

Furthermore, the evidence at trial showed that Defendants had a reasonable basis to be concerned about Plaintiff's conduct, even construing the evidence and all reasonable inferences

in his favor.   Regarding his June 10 conversation with Pratcher, Plaintiff admitted that it took place in a lobby of a public building, during a conference attended by hundreds of people; that he told Pratcher that the legislation was "bigger" than the jobs of Pratcher, Etienne, and Comptroller DiNapoli; that he discussed adverse press coverage; that the conversation was "active"; and that Pratcher was allegedly "agitated."   (Tr. 199:21-200:4, 362:11-364:19.)   The record also establishes, without contradiction, that Pratcher was "visibly shaken" immediately after the conversation, and that he immediately reported it to his boss, Etienne.  (Tr. 1689:9-21, 1397:17-1398:7.)   There is no basis to question that Pratcher was genuinely upset by Richardson's conduct in that conversation.

Likewise, as to Etienne's interactions with Richardson, the undisputed record establishes that at the Toigo Gala, Richardson was oblivious to Etienne's desire to wait until a more appropriate time to discuss his concerns, that he unfairly criticized her for not making her concerns known earlier—even though he knew that the OSC had expressed those concerns since at least April—and that he disingenuously told her it was too late for him to do anything about the OSC's concerns at the same time that, behind the scenes, he and CUP were still actively involved in *opposing* efforts to accommodate the OSC's desire for revisions to the bill.  (Tr. 1091:9-1092:23, 382:11-384:15, 433:17-438:10.)

In this light, as set forth in greater detail below, *see* Point II, *infra*, Richardson's conduct raised serious questions about his character, professionalism, and judgment, which Defendants reasonably believed would be a problem in the OSC's ongoing relationship with Richardson and potentially interfere with the OSC's partnership relationship with ICV.  As discussed below, reasonable state officials in Defendants' position could believe that Plaintiff's conduct would likely impair his ability to work effectively for the Common Retirement Fund, so that the

- 10 -

Plaintiff's interests in engaging in the First Amendment activities at issue were outweighed by Defendants' interests in a smoothly functioning contractor relationship.   As a result, the Plaintiff's interests in his First Amendment activities do not "so clearly" outweigh the disruption likely caused by his conduct that every reasonable state official standing in Defendants' shoes would have known that their actions violated Plaintiff's rights.

Even if the Court believes that Defendants' estimation of the harm that Richardson's conduct would potentially cause to his relationship with the OSC was overstated, the record establishes that it was reasonable given the information available to Defendants and the circumstances at the time.  Defendants were in the midst of overseeing the OSC's response to an intensive Attorney General investigation of unethical behavior by investment managers.  (Tr. 1302:20-1303:18, 1073:2-1075:23.)  They ignored questions about investor professionalism and integrity at their peril.  (Tr. 1073:2-1075:23, 1300:23-1302:19.)  Indeed, Pratcher testified about an investment manager (Lawrence Penn) who was rejected because of what appeared at the time to be minor overstatements on his resume—as Pratcher testified, at the time he thought that perhaps "we're taking this fiduciary thing maybe a little too far."  (Tr. 1300:23-1302:19.)  But, "fast forward three years, and . . . that same investor pled guilty to stealing $9 [m]illion from investors out of a fund that we were supposed to be invested in." (*Id.*)[4]

Defendants are entitled to qualified immunity even if some of the facts on which they relied were erroneous, because they reasonably believed those facts given the information available to them at the time.  Testimony at trial established that Defendants reasonably believed that there had been a failure to communicate the OSC's revised draft to the bill sponsors, for

---

[4] The transcript erroneously states "billion" instead of "million."  Defendants have submitted a letter asking the Court to correct this typographical error in the transcript.

which CUP bore some responsibility.  In addition to Defendants' testimony that they understood the bill sponsors to have told them at the June 21 meeting that CUP had not passed on the June 2 OSC draft (Tr. 1400:23-1402:20, 1093:24-1094:9), Comptroller DiNapoli testified that there was confusion expressed during that meeting about the communication of drafts of the bill (Tr. 977:5-12), and Shawn Thompson confirmed that Senator Ruth Hassell-Thompson and others claimed they had not received the OSC's draft.  (Tr. 1642:2-10 ("Senator Hassell-Thompson seemed upset.  And it was clear that there was some misunderstanding that they may not have, in fact, seen our legislation, and a little bit of back-and-forth with respect to that.").)  And Jackie Williams testified that immediately following the meeting, Senator Hassell-Thompson told her that "the advocates messed this up."  (Tr. 1754:9-14.)

We recognize that the Second Circuit has held that a defendant who is found to have acted with retaliatory intent is not entitled to qualified immunity, Op. at 36-37, and Plaintiff will undoubtedly point to the jury's verdict as a bar to qualified immunity here.  The Court should reject this contention, for several reasons.  First, and most important, as discussed in detail below, the jury's verdict does not establish that Defendants acted with the intent to retaliate against Plaintiff for the exercise of his First Amendment rights, because the Court's instructions on this key element were erroneous, and failed to properly focus the jury on the crucial distinction between (a) Defendants retaliating against Plaintiff because he was engaged in protected First Amendment activity and (b) Defendants responding to Plaintiff's conduct in their interactions with him, which happened to be in the context of his First Amendment activity.  As a result of this instructional error, it is impossible to determine whether the jury actually found that Defendants had the improper motive of seeking to retaliate against Plaintiff because of his First Amendment activity.

Second, as discussed below, the evidence on this point was so one-sided and overwhelming that no reasonable jury, properly instructed, could have found that Plaintiff met his burden to prove that Defendants acted with the intent to retaliate against him for the exercise of his First Amendment rights.

And third, as discussed above, the case law requires the Court to ask the jury to make findings of fact with regard to the key factual issues that must be resolved to enable the Court to resolve the qualified immunity issue.  Accordingly, Defendants requested that the Court amend Section III of the Special Verdict Form to include specific factual questions regarding the nature of Plaintiff's interactions with Defendants in June 2010.  *See* Defendants' Proposed Special Interrogatories, Doc. No. 127-1, filed March 13, 2015; Defendants' Letter to the Court, dated May 5, 2015, Doc. No. 194 (enclosing Defendants' Revised Proposed Special Interrogatories). In the Court's Opinion and Order on summary judgment, the Court identified the following disputed issues of material fact regarding the *Pickering* balancing and the qualified immunity defense: "'the manner in which' a speech was delivered, whether the speech 'had the potential to disrupt' a government function, and 'whether even if such disruption occurred, plaintiffs were in fact not dismissed because of the disruption but because of the content of their speech.'"  Op. at 25.  The disputed facts included whether Plaintiff "acted rudely or unprofessionally in their June 10 conversation"; whether he "referred to S.6888 as his legislation, threatened to go to the press, claimed responsibility for Pratcher's employment, or asserted that his business was more important than Pratcher's or the Comptroller's job"; as well as whether the conversation was "loud or argumentative."  *Id*. at 26.  As to Plaintiff's interactions with Etienne, the Court found that the following facts were disputed: whether his demeanor and statements were inappropriate; whether he lied to her when he said it was "too late" to do anything about the bill; and whether

he merely politely informed Etienne that he wished she had told him earlier that the OSC had concerns with the bill because its sponsors had taken primary responsibility for it.  *Id*. at 27-30. Finally, the Court noted that it was a material issue of fact whether the bill sponsors claimed that they did not receive the June 2 OSC draft at all, and whether that was CUP's fault.  *Id*.

Defendants requested that the Court ask the jury a variety of questions addressed to these topics in the Special Verdict Form (Defendants' Proposed Special Verdict Form, Doc. No. 127-2, filed March 13, 2015), and then submitted a more targeted set of questions in connection with the charge conference (Defendants' May 5 Letter, Doc. No. 194, & Exhibit 1).  These requests appropriately asked the jury to make the specific factual findings that would be important to the Court in revisiting the qualified immunity and *Pickering* determinations.

However, the Court erroneously rejected these requests, and there is therefore no way to know what facts the jury found.  To the extent the Court asked the jury special interrogatories, they were questions that went exclusively to the *Pickering* issues (asking whether Defendants reasonably believed that Plaintiff's conduct would interfere with his ability to function effectively as an asset manager for the Common Retirement Fund), rather than any findings of fact regarding the interactions between Plaintiff and Defendants.  And the interrogatories posed by the Court were too general and conclusory to be of any real utility in ascertaining what facts the jury found.  As Defendants argued, they were more akin to seeking an advisory opinion from the jury as to how the Court should rule on the *Pickering* issues than really making findings of fact.  (Feinberg Decl., Ex. 4, at 7-10; Defendants' May 5 Letter, Doc. No. 194, at 5.)

For all these reasons, Defendants believe that they are entitled to judgment as a matter of law on grounds of qualified immunity.  However, in the alternative, if the Court disagrees, Defendants submit that they are entitled to a new trial, both because the "facts" allegedly found

by the jury regarding the Defendants' retaliatory motive are against the great weight of the evidence and because the Court erroneously failed to ask the jury to make the findings of fact necessary for the Court to properly determine the qualified immunity issue.

## II.   PLAINTIFF'S CONDUCT WAS NOT PROTECTED UNDER *PICKERING*.

The Court should also grant Defendants judgment as a matter of law because Plaintiff's behavior was not protected under *Pickering*.  A government employee's First Amendment rights are not absolute: when the government acts "as an employer . . . , the Constitution provides a State with greater leeway to control employees' speech that threatens to undermine its ability to perform its legitimate functions."  *Lewis v. Cowen*, 165 F.3d 154, 161 (2d Cir. 1999) (citation omitted).  Under *Pickering*, the court must "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568; *accord Castine v. Zurlo*, 756 F.3d 171, 175 (2d Cir. 2014); *see also Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011).  This balancing test applies to state contractors, with appropriate adjustments "to weigh the government's interests as a contractor rather than as an employer."  *Umbehr*, 518 U.S. at 673.  Whether a plaintiff's conduct is protected under *Pickering* is a question of law for the Court.  *Lewis*, 165 F.3d at 164; Op. at 25.

Under *Pickering*, the court "must consider whether the statement sought to be protected 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships, . . . or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'"  *Lewis*, 165 F.3d at 162 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).  In this analysis, "[t]he 'manner, time and place' in which the speech occurs is important in determining whether it is protected.  For example, the *Pickering* balance is more likely to favor the government when an employee directly confronts

his supervisor with objectionable language." *Id.* (citations omitted).  *See also Iannillo v. Cnty. of Orange*, 187 F. Supp. 2d 170, 184 (S.D.N.Y. 2002) (plaintiff's "comment would undoubtedly not merit protection under the *Pickering* test" where plaintiff made statement in government training session that "resulted in several other participants being offended.").   Additionally, "preservation of close working relationships involving personal loyalty or confidence can be relevant to the employer's interest."  *Giacalone*, 850 F.2d at 87.

The government, moreover, "need only show a '*likely* interference' with its operations, and 'not an actual disruption.'"  *Lewis*, 165 F.3d at 163 (citations omitted).   If the *Pickering* balance weighs in favor of the government, the plaintiff's conduct is not protected by the First Amendment.  *See id.* at 167 (holding that "plaintiff did not engage in protected speech under the *Pickering* test" because the government's interest in efficient operation outweighs the plaintiff's interest in the speech).   Courts routinely find that rude or confrontational conduct is sufficient to show likely disruption to the government's operations.  *See, e.g.*, *Waters v. Churchill*, 511 U.S. 661, 680-81 (1994) ("unkind and inappropriate" language which threatens to "undermine management's authority" qualifies as language which disrupts the workplace); *Finn v. N.Y. State Off. of Mental Health-Rockland Psychiatric Ctr.*, 489 F. App'x 513, 514 (2d Cir. 2012) ("[T]he manner of Finn's speech was 'threatening, rude, and offensive' and therefore provided valid grounds for his dismissal."); *Giacalone*, 850 F.2d at 79 ("confrontational" nature of plaintiff's memorandum could reasonably lead supervisors to believe that disruption would result); *see also Bailey v. Dep't of Elementary & Secondary Educ.*, 451 F.3d 514, 521 (8th Cir. 2006) (arguing with supervisor during a "heated" meeting and "confrontation" at conference is sufficient evidence of disruption); *Germann v. City of Kansas City*, 776 F.2d 761, 763-65 (8th Cir. 1985) (letter regarded as insulting reasonably led defendant to question plaintiff's respect for him).

Because Richardson was an independent contractor, his speech and related activities are not protected if his First Amendment interests are outweighed by a state official's reasonable expectation that his conduct would likely (1) interfere with his work for the state or (2) have a detrimental effect on the working relationship between the OSC and ICV (including with Richardson himself). *Lewis*, 165 F.3d at 162.  Here, the evidence made clear that Plaintiff was not engaged in protected conduct during his interactions with Defendants in the summer of 2010.

Plaintiff did not have a strong First Amendment interest in approaching Defendants as he did in this case.  While the proposed legislation was a matter of significant public interest, there was no substantial reason why Plaintiff was reaching out to discuss the legislation with Defendants.  Defendants were not the key decisionmakers with respect to the legislation, and had merely been dragged into discussions about the legislation because they had the relevant substantive knowledge about the Common Retirement Fund and the Emerging Manager Program.  And the OSC's position on the proposed legislation had long been clear, as the evidence at trial overwhelmingly showed, and as Plaintiff well knew.  Plaintiff had deliberately refrained from participating, along with other advocates, in the meetings with the Comptroller's Office where the legislation was substantively discussed.  This was not a serious effort by Plaintiff to engage Defendants about the terms of the legislation; instead, it was the Plaintiff seizing an opportunity to complain to his friends and express his frustration and disappointment that they had not supported the bill.

On the other side of the balance, Defendants reasonably found that Richardson's conduct towards them was problematic, and would interfere with their future working relationship.  As discussed above (pp. 9-10, *supra*), with regard to Plaintiff's June 10 conversation with Pratcher, there is no question that Plaintiff chose to engage Pratcher at a public event (rather than arrange a

more appropriate meeting to discuss the issue, which he could readily have done at any time), and to have a conversation which even Plaintiff admits was "active" and in which Pratcher, at least, was "agitated."  There is no dispute that Plaintiff told Pratcher that the legislation was "bigger" than his job or Comptroller DiNapoli's reelection, which Pratcher could reasonably find offensive and condescending, or that the conversation included discussion of adverse press coverage.  And Pratcher's testimony provided many more details as to why he found Plaintiff's conduct inappropriate, disrespectful, disingenuous, and threatening.[5]  Likewise, as to Etienne's interactions with Plaintiff, the evidence shows that Etienne reasonably believed that Plaintiff had unfairly criticized her for not making her concerns known earlier, and that he was being disingenuous in telling her that it was too late for him to do anything about the OSC's concerns.[6]

---

[5] Other evidence at trial provided strong corroboration for Defendants' testimony that Plaintiff had acted in an overly aggressive and unprofessional way during his interactions with them.  For example, on the same date, Plaintiff instructed others at CUP to be "more aggressive" in lobbying the OSC about the bill, in the wake of the bill's "near death experience." (Tr. 621:9-622:23; Feinberg Decl., Ex. 6 (Defendants' Trial Exhibits (hereafter "DTX")), at DTX F4, DTX D4.)  In addition, even Plaintiff's colleagues at ICV had repeatedly raised issues about his personality and demeanor, which was often aggressive, off-putting, and unfairly critical.  (DTX E, DTX G, DTX I, DTX R.)  Indeed, Paul Williams also acknowledged that Plaintiff could sometimes come across as "condescending."  (Tr. 1169:21-1170:2.)

[6] The Court, in its summary judgment opinion, stated that "[e]ven if Richardson's prediction was not entirely correct – that, in fact, CUP could have influenced the bill sponsors – this legislative prediction was not so disruptive that summary judgment is appropriate."  Op. at 30.  This observation misses the point.  Defendants were entitled to expect absolute candor and honesty

The evidence at trial demonstrated that Defendants' concerns about Plaintiff's conduct would reasonably lead a state official in their position to believe that it would likely interfere with his work for the state and/or have a detrimental effect on the working relationship between the OSC and ICV.  Pratcher and Etienne have explained, and Richardson does not dispute, that an asset manager who is engaging in rude, condescending, threatening, misleading, and manipulative conduct would necessarily be viewed as not competent to be trusted with managing Common Retirement Fund investments.  (Tr.  1082:2-20,  1300:23-1302:19.)   Plaintiff acknowledged that the private equity industry depends upon investors having trust and confidence in investment managers.  (Tr. 285:23-286:8 ("if you can't rely on someone with your money or you can't trust them, then who on earth is going to give you their money, let alone a public pension fund").)  Moreover, Woods, Etienne, Pratcher, and Joe Dawson all explained that it is essential for investors to evaluate the qualitative aspects of an asset manager, including an assessment of their professionalism, judgment, and trustworthiness, particularly for private equity investments—which require entering into a partnership with the asset manager, involving the commitment of large sums of capital for years at a time.  (Tr. 1300:23-1302:19, 843:19-844:4, 872:17-873:18, 1678:13-1679:10, 1691:3-1692:4, 1080:13-1082:20.)

Richardson's conduct towards Defendants was particularly problematic because ICV was in a partnership with the OSC and Richardson was supposed to act, at all times, as their fiduciary.  (Tr. 1394:7-1395:25, 1691:3-1692:4.)  In this context of this relationship, built on trust, an investment manager who made comments that raised questions about his judgment, candor, and professionalism would reasonably raise substantial questions about the OSC's ability

---

from one of their fiduciaries, and they could reasonably be troubled by Plaintiff's lack of candor and disingenuous statements.

to work with him in the future.  Indeed, Woods warned Plaintiff about similar alleged conduct in the past (Tr. 840:11-848:3), which is compelling evidence that engaging in such conduct would reasonably threaten the relationship between ICV (and Plaintiff) and state investment officials.

Thus, on the facts proved at trial, *Pickering*'s balancing test shows that Plaintiff's conduct vis-à-vis Defendants was not constitutionally protected under the First Amendment. Plaintiff's interest in engaging in the First Amendment activities at issue was outweighed by Defendants' interests in a functioning relationship with its contractor.

We recognize that the jury's answers to the special interrogatories posed by the Court found that Defendants did not reasonably conclude that Plaintiff's conduct would likely interfere with his ability to function effectively as an asset manager for the Common Retirement Fund. But the jury's response to these interrogatories is not controlling, for several reasons.  First, the questions posed did not ask the jury to make any findings of historical fact, as Defendants urged the Court to include.  Instead, the questions were very general, and improperly asked the jury to make ultimate legal conclusions that should have been reserved to the Court, i.e., whether Defendants reasonably concluded that Plaintiff's conduct would likely interfere with his ability to function effectively.  *See* Feinberg Decl., Ex. 4, at 7-10.  Second, Defendants are entitled to judgment as a matter of law, because no reasonable jury could come to the conclusion that Defendants did not reasonably conclude that Plaintiff's conduct impaired their trust and confidence in him and would be a serious issue in the OSC's ongoing relationship with ICV. And third, in the alternative, the jury's determination is against the clear weight of the evidence, and the Court should grant Defendants a new trial under Rule 59.[7]

---

[7] We also recognize that the *Pickering* test provides no support for a defendant if he or she in fact acted with retaliatory intent, rather than because of his or her reasonable prediction of likely

### III.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, A NEW TRIAL, BECAUSE THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUPPORT LIABILITY UNDER § 1983.

#### A.  The Applicable Legal Standards.

Under Rule 50, following the conclusion of trial, "the court may . . . direct the entry of judgment as a matter of law," if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50.   The applicable standard is the same standard that applies to a pretrial motion for summary judgment pursuant to Rule 56.   *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250-51 (1986). "Simply stated, [the standard] is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached."  *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970).

In deciding whether there is sufficient evidentiary basis for the jury's verdict, the Court "should not rely on the jury's findings"; rather, it "must make an independent assessment of the sufficiency of the nonmovant's evidence."  9B Charles A. Wright & Arthur A. Miller, *Fed. Prac. & Proc. Civ*. § 2524 (3d ed. 2004).  The court "cannot let a verdict stand where it is grounded on 'such a complete absence of evidence ... that the jury's findings could only have been the result of sheer surmise and conjecture.'" *Goldhirsh Grp., Inc. v. Alpert*, 107 F.3d 105, 108 (2d Cir. 1997) (citation omitted).   "The jury's role as the finder of fact does not entitle it to return a verdict based only on confusion, speculation or prejudice"; rather, the law requires that "its

---

disruption.  Op. at 23-24.  However, for the reasons explained above, the jury's verdict does not establish that Defendants here acted with retaliatory intent, among other reasons because the jury was not properly instructed on this element.

verdict must be reasonably based on evidence presented at trial." *Id.* (quoting *Michelman v. Clark–Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042 (2d Cir. 1976)).  In ruling on a Rule 50 motion, therefore, the Court must draw the line between permissible inferences and impermissible speculation," which "is not always easy to discern." *Id.*

Under Rule 59, the Court may grant a new trial on all or some of the issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).  Under this rule, "[a] new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (citation omitted).  Rule 59 motions differ from Rule 50 motions in two significant ways.  First, "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." *Id.* at 134. "Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. " *Id.*  "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is 'egregious.'" *Id.*  "As a general matter, '[a] motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice.'" *Id.*

Here, as discussed below, Defendants seek post-trial relief on both liability and damages.

### B. There Was Insufficient Evidence for A Reasonable Jury To Find That Defendants Took Adverse Action Against Plaintiff.

First, Defendants are entitled to judgment as a matter of law because no reasonable jury could find that Defendants' actions qualified as adverse actions against Plaintiff based on the evidence presented at trial.  An adverse action is an action that "would deter a similarly-situated individual of ordinary firmness from exercising his or her constitutional rights." *Hoyt v.*

*Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006).  To satisfy this element, the plaintiff is obligated to prove that "*the defendant took* adverse action against the plaintiff," not merely that the plaintiff suffered damages.  *See Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) (emphasis added).

Because of an "employer's duty, as described in *Waters*, to make a reasonable investigation before imposing discipline on an employee for engaging in protected speech," a claim "that defendants conducted an investigation is not a valid First Amendment claim." *Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir. 1998) (citing *Waters*, 511 U.S. at 673, 677).  *See also Boylan v. Arruda*, 42 F. Supp. 2d 352, 357 (S.D.N.Y. 1999) ("[S]imply undergoing an investigation is not sufficient to constitute 'adverse employment action,' even though the allegedly retaliatory investigation in this case was criminal rather than civil in nature and was conducted by an outside agency rather than internally.").  Likewise, a defendant simply following "normal operating procedure" is not the "type of action" that would qualify as an adverse action.  *Otte v. Brusinski*, 440 F. App'x 5, 7 (2d Cir. 2011) (summary order).  For similar reasons, mere criticism does not qualify as adverse action.  *See Mallett v. Town of Plainville*, No. 3:01 CV 1137 (AHN), 2006 WL 931712, at *8 (D. Conn. Apr. 4, 2006) ("The fact that Becker may have criticized Mallett for leaking information to Cunningham about alleged time-card abuses does not rise to the level of actionable retaliation because criticism alone is not a material change in the terms and conditions of employment."); *see also Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 270 (E.D.N.Y. 2012) (holding that alleged constructive discharge and threats to terminate did not qualify as adverse actions).

The Second Circuit's decision in *Otte* is instructive.  In *Otte*, the Second Circuit held the plaintiff suffered no adverse employment action where the only detriment Plaintiff alleged—his transfer from one floor to another—was an action that the employer had the right to take

pursuant to a collective bargaining agreement.  440 F. App'x at 7.  The Court observed that the alleged adverse action "was made as a result of [Defendant manager's] claim that [Plaintiff's] comments were threatening."  *Id.*  It reasoned that because "[i]t is undisputed that the facility's normal operating procedure was to separate an employee from a supervisor when a threat was alleged to have been made," "[Plaintiff's] transfer was not the type of action that 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights' and was therefore not an adverse employment action." *Id.* (citation omitted).  In reaching this conclusion, the Court noted that defendants' actions were consistent with the "normal operating procedure" in response to a claim that a threat had been made—and it did not find it necessary to address whether that threat had in fact been made.  *See id.*

At trial, Plaintiff identified two alleged adverse actions taken by Defendants: (1) Pratcher's June 17 email suggesting they discuss taking additional time to consider the ICV Growth proposal; and (2) Pratcher and Etienne's agreeing to meet, and meeting, with Woods, at Woods' request, to discuss their concerns about Richardson.

Regarding Pratcher's alleged actions regarding ICV Growth, the evidence at trial established only that Pratcher sent an email asking to have a discussion about whether to take more time before entering into legal negotiations regarding the proposed investment.  (Feinberg Decl., Ex. 7 (Plaintiff's Trial Exhibits (hereafter "PTX")), at PTX 38.)  There is no evidence that this discussion ever took place.  (Tr. 1308:11-16.)  There is no evidence that, apart from sending the June 17 email, Pratcher did anything with respect to ICV Growth.  Thus, there is no evidence that Pratcher took any action to "kill" the proposed investment, as Plaintiff claims.  (Tr. 1473:9-25, 1719:14-1720:2.)  In fact, all the evidence was to the contrary:  Pratcher testified, and Dawson confirmed, that Pratcher did not have unilateral authority to kill the OSC's investment in

- 24 -

ICV Growth.  (Tr. 1265:4-8, 1308:17-1309:19, 1719:14-17.)  The evidence also established that the OSC never made a final decision on whether to invest in ICV Growth.  (Tr. 1308:17-1309:19, 1473:9-25, 1689:6-8.)  Thus, the most that can be said is that Pratcher asked to have a discussion about taking additional time to consider the next stage in the investment.  This does not qualify as an adverse action as a matter of law.  Indeed, it represents lesser action than initiating an investigation, which the courts have held not to qualify as an adverse action as a matter of law.

Defendants' meetings with Woods also do not constitute adverse actions against Plaintiff as a matter of law.  The record is clear that neither Defendant reached out to Woods at all, much less with the purpose of causing any harm to Plaintiff.  (Tr. 1222:7-1223:8, 1096:17-1097:11.) Rather, the record establishes that both Defendants met with Woods as a professional courtesy, at his request because it was the right thing to do when an issue had arisen in the relationship between the OSC and one of its investment partners, so that Woods could learn about Plaintiff's interactions with Defendants and begin to repair ICV's relationship with the OSC.  (Tr. 1222:7-9, 1096:17-1097:11, 1408:12-1411:13.)  As Dawson testified, his communications with Woods were intended to be a first step in "trying to get to the bottom of" Richardson's interactions with Pratcher and Etienne, which he viewed as the beginning of an investigation.  (Tr. 1712:10-18). Again, the law is clear that merely initiating an investigation does not qualify as an adverse action as a matter of law.  *See Heil*, 147 F.3d at 110.

Furthermore, the record establishes that Defendants' agreeing to meet with Woods was part of the OSC's standard procedure for addressing a concern about an investment manager's conduct.  Etienne and Comptroller DiNapoli both confirmed that it was appropriate to raise concerns about an asset manager with the manager's firm (Tr. 965:18-966:12, 1096:22-1097:11),

and this is especially true when the firm requested the meeting in the context of an ongoing relationship. Further, such communication was consistent with the ongoing partnership agreement between the OSC and ICV regarding ICV Fund II, which gave the OSC the right to monitor the behavior of ICV's key men, including Richardson. (Tr. 697:12-14; DTX B, at 11, 28, 42.) Under *Otte,* merely following normal operating procedure, particularly when authorized by pertinent agreements, in response to a claim that a threat was made does not qualify as an adverse action. 440 F. App'x at 7.

> The fact that Plaintiff claims that these meetings led to his termination does not alter this result. There is no evidence that this was a result that Defendants intended or contemplated. Indeed, Pratcher and Dawson did not know that Woods had the authority to take action against Richardson until late in their meeting, at which point they urged Woods *not* to take action against him. (Tr. 1256:6-1257:16, 1693:8-1695:8.) But what Woods allegedly did as a result of these meetings is not an adverse action *taken by Defendants*. Defendants are not themselves alleged to have terminated Plaintiff—they did not, for example, sever the OSC's relationship with ICV. (Indeed, to the contrary, Pratcher told JoAnn Price that he would have others in the OSC work with ICV in the future. (Tr. 1250:20-1251:5.)

Likewise, the conclusion that Defendants took no adverse action against Plaintiff is not disturbed by Plaintiff's evidence that Pratcher made a comment to the effect that it would be hard to do business with a firm that had someone like Richardson on its team. Pratcher and Woods testified without contradiction that this comment was not intended, nor was it interpreted to be, a direction that Woods take adverse action against Richardson, or a threat that the OSC would cease doing business with ICV if Richardson remained in his current status there. (Tr. 1254:17-

1255:20, 1428:21-1429:13, 872:17-24, 874:14-875:7.)   Rather, both explained that it simply meant that Pratcher's concerns made it difficult for him to champion ICV within the OSC.  (Tr. 1254:17-1255:20, 1428:21-1429:13, 872:17-24.)  Indeed, Pratcher made clear to Price that he felt that others in the OSC could faithfully evaluate future proposals from ICV, even if Mr. Pratcher were not personally involved.  (Tr. 1250:20-1251:5.)  Woods clearly did not take this comment as indicating that the OSC would not do business with ICV if Richardson remained employed there, because on August 9, he offered terms to Richardson which would have allowed him to stay with the firm.  (Tr. 883:15-885:18; PTX 59.)

Similarly, Etienne's criticism of Woods' management of ICV during their meeting did not constitute an adverse action, because that criticism was made in response to Woods' claim that he had not known what his partner Richardson was doing, and in response to Woods' assertion that Plaintiff had been the sole point of contact between ICV and the OSC.  Etienne regarded Woods' claimed lack of knowledge as reflecting badly on his management of the firm, and viewed his having only Richardson as his sole point of contact with the OSC to be poor management, because good practice required multiple points of contact between a firm and its clients.  (Tr. 1098:16-1099:9, 766:3-13.)  In any event, mere criticism is not, as a matter of law, sufficient to constitute an adverse action.

Thus, as a matter of law, none of the conduct alleged by Defendants qualifies as an adverse action against Plaintiff.  Accordingly, no reasonable jury could find that Plaintiff satisfied his burden to prove that Defendants took an adverse action against him.

### C. No Reasonable Jury, Properly Instructed, Could Find That Defendants Retaliated Against Richardson Because of an Improper Motive.

Defendants are also entitled to judgment as a matter of law because no reasonable jury, properly instructed, could find that Plaintiff met his burden to prove that either Defendant

- 27 -

intended to retaliate against him for his alleged First Amendment activities.

In a First Amendment retaliation action, "[t]he plaintiff bears the 'initial burden of showing that an *improper motive* played a substantial part in defendant's action.'" *Anemone*, 629 F.3d at 114 (quoting *Scott*, 344 F.3d at 288) (emphasis added). The plaintiff may only prevail by showing that the adverse action against him was taken "as a form of retaliation." *Greenwich Citizens Comm., Inc. v. Cntys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996).

Here, no properly instructed jury could find that Plaintiff satisfied his burden to prove this element at trial. We recognize that the jury did return a verdict purporting to find that Plaintiff's First Amendment conduct was a "motivating factor" in the Defendants' actions. (Feinberg Decl., Ex. 4, at 1-3.) However, as discussed below, the jury's verdict was based on erroneous jury instructions, and therefore provides no proper basis for concluding that Defendants acted with retaliatory intent. In any event, the jury's verdict that Defendants intended to retaliate against Plaintiff because of his First Amendment activity, rather than because of his conduct in his interactions with them, is not supported by the evidence at trial.

### 1.   The Court's Instructions Were Erroneous.

In *Greenwich*, the Second Circuit held that it is error not to instruct a jury specifically regarding the plaintiff's duty to prove "retaliatory intent" in a Section 1983 case where, as here, "the defendant does not dispute that it acted in response to the plaintiff's conduct, but asserts that its response was prompted by a legitimate reason, not an impermissible one." *Id.* at 33. In such cases, the Second Circuit held that the jury instructions must "focus[ ] precisely on whether the defendant acted for an impermissible reason, and not merely in response to the plaintiff's conduct." *Id.* The Court warned that using the usual language to describe this element—that the defendant acted *because of the plaintiff's protected conduct*—is inappropriate in this type of

case:  "In these situations, 'protected conduct' does not necessarily equal 'impermissible reason,' and *if the test of 'but for' causation is phrased in terms of the impact of the 'protected conduct,' then this phrase becomes an inadequate proxy for the proper inquiry into whether the defendant acted with retaliatory intent*."  *Id.* (emphasis added).  Without observing this distinction, "a finding that the defendant acted because of the protected *conduct*" would be "tantamount to a finding that the defendant acted with retaliatory *intent*," which would impermissibly relieve the plaintiff of the burden to prove retaliatory intent.  *Id.* (emphasis in original).

The Court in *Greenwich* therefore reversed for a new trial.  The Court recognized that the "Greenwich plaintiffs [had] shown cause and effect, in the strict sense that [defendants] would not have [taken the alleged adverse action] 'but for' the Greenwich plaintiffs' [protected activity]."  However, this was insufficient to support their cause of action.  In addition, the Court held, "the Greenwich plaintiffs are nevertheless required to persuade the jury that the [alleged adverse action was taken], not as a legitimate response to [plaintiff's First Amendment activity], but as a form of retaliation, with the purpose of deterring the exercise of First Amendment freedoms."  *Id.* at 31.

Here, Jury Instruction No. 6(B)(2) concerned what Plaintiff must prove to satisfy his burden on the element of retaliatory intent.  (Feinberg Decl., Ex. 3, at 20-25.)  As originally drafted by the Court, this instruction stated that Plaintiff need only prove that "the defendant you are considering took an adverse action against the plaintiff in substantial part *because of the plaintiff's speech, association, or petitioning . . . .*"  (Feinberg Decl., Ex. 1, at 24 (emphasis added); *see also id.* at 21 (jury must find that "the *Plaintiff's First Amendment activities were a motivating factor* in the defendant's decision to take adverse action against the plaintiff"); *id.* at 23 ("the plaintiff must show that *his speech on behalf of pending legislation, association with the*

*Council of Urban Professionals, or petitioning for legislation was a motivating factor* in the defendant's decision to take adverse action against Mr. Richardson.").)  Defendants objected to this language during the charge conference on May 5, 2015 (Tr. 1923:11-1925:17, 1933:10-1939:2), and then elaborated in a letter submitted to the Court later than evening (Defendants' May 5 Letter, Doc. No. 194).  Defendants explained that the Court's proposed charge did not comply with the requirement of *Greenwich* and *Anemone* that the jury be instructed that it must find that the Defendants acted with "intent to retaliate against Mr. Richardson for his exercise of this First Amendment rights," and not merely "because of" the Plaintiff's allegedly protected First Amendment activities.

On May 6, 2015, at the continuation of the charge conference, the Court proposed adding a paragraph to Instruction No. 6(B)(2), so that it contained the following language:

> The plaintiff  must show that the defendant you are considering retaliated against the plaintiff for an impermissible reason, namely because of the plaintiff's speech on behalf of pending legislation, association with the Council of Urban Professionals, or petitioning for legislation, and not merely in response to the plaintiff's conduct.  The plaintiff bears the burden of proving that an improper motive played a substantial part in the actions of the defendant you are considering.  Again, you must make this determination separately as to Mr. Pratcher and Ms. Etienne.

(Feinberg Decl., Ex. 2, at 23.)  As the Court noted, this proposed wording tracked, "almost *in haec verba*," the Second Circuit's language in *Anemone.*  (Tr. 1985:23-24.)  Plaintiff, however, objected to the instruction and requested alterations, which the Court granted.   Defendants objected that the alterations requested by Plaintiff took out the focus on the key distinction required by *Greenwich* and *Anemone*, failed to specify that Plaintiff must prove that Defendants acted with the intent to retaliate for the Plaintiff's First Amendment activity, and changed the language back so that it once again contained effectively the same language found to be in error in *Greenwich.*  (Tr. 1990:2-1992:16.)  Nevertheless, the Court overruled Defendants' objections

and adopted Plaintiff's requested alterations.  (Tr. 1993:18-1994:1.)

> As a result, the final version of this instruction, as delivered to the jury, stated as follows:

> The plaintiff must show that the defendant you are considering retaliated against the plaintiff because of the plaintiff's speech on behalf of pending legislation, association with the Council of Urban Professionals, or petitioning for legislation, and not merely in response to something other than the plaintiff's protected speech, association, or petitioning.  The plaintiff bears the burden of showing that the protected speech, association, or petitioning played a substantial part in the actions of the defendant you are considering.   Again, you must make this determination separately as to Mr. Pratcher and as to Ms. Etienne.

(Feinberg Decl., Ex. 3, at 23.)  Thus, the final version of Instruction No. 6(B)(2) did not include

any requirement that the jury find that the Defendants had any retaliatory intent and failed to

focus the jury on the crucial distinction between the Defendants responding to Plaintiffs' conduct

in the course of his conversations with them and the Defendants having the intent to retaliate

against Plaintiff because of his First Amendment activity.

The language of the instruction read to the jury tracks, almost verbatim, the language the

Second Circuit in *Greenwich* held to be reversible error.   By telling the jury that Plaintiff's

burden was only to prove that the defendant "retaliated against the plaintiff *because of plaintiff's

speech on behalf of pending legislation*"—in a case where Defendants did not contest that they

were reacting to Plaintiff's speech towards them in June 2010, but very much disputed that they

acted with retaliatory intent—the Court's instruction was, like the instruction in *Greenwich*, "an

inadequate proxy for the proper inquiry into whether the defendant acted with retaliatory intent."

77 F.3d at 33.   Contrary to the Court's ruling that it was not necessary to include language

specifying that the jury must find that Defendants acted for an impermissible reason, *i.e.*, with an

intent to retaliate for Plaintiff's protected First Amendment activities (Tr. 1993:18-1994:1),

*Greenwich* in fact holds that in a case of this kind, "claims of alleged retaliation . . . require

focusing precisely on whether the defendant acted for an impermissible reason, and not merely in

response to the plaintiff's conduct."  77 F.3d at 33.

By failing to include this concept, the Court's instruction strongly suggested that the Plaintiff has proved this element if he merely shows that Defendants took adverse actions in response to Plaintiff's speech with them in June 2010.  Under *Greenwich*, this was error: in a case of this kind, Plaintiff must prove not merely that Defendants acted "because of" his protected conduct, but that they did so "as a form of retaliation."  *Id*. at 31.

This error in the Court's instructions was compounded because the instructions elsewhere strongly implied that Plaintiff's activities were protected by the First Amendment, when that determination was an issue of law for the Court, which had not (and still has not) been made. *Lewis*, 165 F.3d at 164.  Specifically, the Court instructed that: "As a matter of law, the First Amendment generally provides for the right to speak about a matter of public concern, the right to associate with public policy organizations, and the right to petition the government for legislation."  (Feinberg Decl., Ex. 3, at 22.)  Defendants objected to this language, in response to Plaintiff's proposed jury instructions, at the charge conference, and in its evening letter to the Court.  (Defs.' Objs. to Pl's Reqs. to Charge, Doc. No. 167, filed April 9, 2015, at 24 ¶ 2; Tr. 1925:18-1933:5; Defendants' May 5 Letter, Doc. No. 194, at 6.)

As Defendants argued, the Court's instruction was an incomplete and inaccurate statement of the law.  By stating that the listed activities are "generally" protected by the First Amendment—without giving any indication of when they might not be—the instruction implied that Plaintiff's activities were in fact protected, failed to account for the fact that the rights of government contractors are not co-extensive with the rights of citizens generally, and failed to acknowledge that adverse actions against government contractors based on their speech are permissible in some circumstances under *Pickering*, 391 U.S. 563, and *Mt. Healthy*, 429 U.S.

274.  *See Heil*, 147 F.3d at 109; *see also Umbehr*, 518 U.S. at 678; *Waters*, 511 U.S. at 672.  The

instruction was not an accurate discussion of the law, and left the jury with the simplistic, but

erroneous, notion that Plaintiff's conduct was protected under the First Amendment, a point that

Plaintiff's counsel exploited at length in his closing argument.  This error was unfairly

prejudicial to Defendants, because it reasonably led the jury to assume that Plaintiff was in fact

engaging in protected activities, and could have led the jury to favor Plaintiff because they

erroneously believed that his rights had in fact been violated.  The correct statement of the law—

that independent contractors have limited First Amendment rights under *Pickering*, and that the

question whether Plaintiff's conduct here qualified for protection was a question of law that had

not been resolved and was only for the Court to determine—was set forth in Defendants'

Proposed Jury Charges.  (Defendants' Proposed Jury Charges, Doc. No. 127, at 19-20.)

The combined effect of these two erroneous jury instructions was devastating to

Defendants' case.  Together, these instructions left no room for the jury to consider one of the

principal arguments in Defendants' defense—that they were not acting with the intent to retaliate

against Plaintiff for his First Amendment activities, but were merely acting in response to his

rude, unprofessional, and threatening conduct in the course of those activities.

### 2.  The Evidence Showed That Defendants Did Not Have Retaliatory Intent.

The evidence adduced at trial was not sufficient for a reasonable jury, properly instructed,

to find that Defendants took any action against Plaintiff with the intent to retaliate for his First

Amendment activities.  Both Pratcher and Etienne were prominent supporters of MWBE causes,

and were not hostile to the underlying goals of the legislation.  (Tr. 336:13-339:9.)  Both were

aware from the beginning that Plaintiff was working on the legislation, and provided assistance

to him in connection with it—in November 2009, when Etienne suggested an expert that Plaintiff

could retain to prepare a disparity study, and in February 2010, when Pratcher, at Plaintiff's request, forwarded the draft bill to others in the OSC.  (PTX 3; PTX 5; DTX Y1; Tr. 1310:5-1311:7.)  Both Pratcher and Etienne knew for months prior to June 10 that Richardson and CUP were advocating for the legislation, but there is no evidence that either of them had any issue with Richardson prior to his confrontation with Pratcher on that date.  (Tr. 1120:17-1121:6, 1297:10-24, 1022:12-1023:8, 1024:24-1026:15, 333:4-14, 337:4-18.)

Furthermore, the undisputed evidence shows that neither Defendant initiated any conversation with Woods; rather, Woods initiated meetings with both Defendants.  These facts are entirely inconsistent with the notion that Defendants intended to affirmatively take action against Plaintiff to retaliate against him, since if Woods had not requested these meetings, there is no evidence that Defendants would have done anything at all.  (Tr. 1413:14-22, 1096:17-23, 875:11-13.)  Indeed, both Pratcher and Dawson testified that both believed, going into the meeting, that Woods did not have the power to take any adverse action against Richardson.  (Tr. 1218:25-1219:13, 1693:8-1694:4.)  Additionally, the testimony by all three participants in the meeting with Woods—Woods, Dawson, and Pratcher—confirms that Pratcher was clear that his concerns about Plaintiff were based on Plaintiff's inappropriate *conduct* during the June 10 conversation, not on his First Amendment activities.  (Tr. 1425:3-1426:5, 1693:2-7, 871:21-872:16.)  Pratcher and Dawson also testified that they told Woods that it was important to them that Richardson remain at ICV because they did not want to see another black financial firm have a problem.  (Tr. 1694:5-22, 1257:2-16.)[8]

---

[8] With regard to Pratcher's June 17 email, Pratcher's testimony establishes that he asked for a discussion about holding off on doing legal work in connection with the proposed ICV Growth

The only evidence to the contrary is the testimony that Pratcher said something to the effect that it would be hard to do business with ICV due to Richardson's conduct and that Pratcher discussed the background of the legislation.  But Pratcher's alleged statement that it would be hard for him to do business with ICV due to Richardson's conduct, if anything, confirms that Pratcher felt that Richardson's *conduct* raised substantial concerns for him; it does not support the argument that Pratcher was reacting to Richardson's protected First Amendment activities.  As for the evidence that Pratcher discussed the background of the negotiations over the bill, both Pratcher and Woods confirmed that the only reason Pratcher spoke about the legislation at all was in response to Woods' request for him to explain the background of his June 10 argument with Richardson.  (Tr. 1425:3-1426:5, 871:21-872:16.)  If Pratcher were truly motivated by Richardson's First Amendment activities, as opposed to his conduct, there is no reason he would have focused on Richardson's conduct and only spoken about the background of the bill because Woods happened to ask about it.[9]

There is similarly no evidence that Etienne acted with a retaliatory motive.  The record is

_____

investment, in part, because of Richardson's conduct and demeanor, not because of Richardson's protected activities.  (Tr. 1272:15-1273:15.)  There is no evidence to the contrary.

[9] Likewise, the testimony that Pratcher asked Woods how Plaintiff had time to do his job while engaging in lobbying activities does not show an intent to retaliate.  Pratcher and Woods confirmed this was a legitimate question in light of Richardson's obligations as a key man under the contractual agreements between ICV and the OSC.  (DTX B, at 11, 28, 42; Tr. 697:12-14.)  Indeed, other ICV investors had asked Woods similar questions in the past, and ICV had for years been concerned that Richardson's activities at CUP were a distraction from his work at ICV.  (Tr. 833:7-834:18; DTX I, DTX G, DTX E, DTX R.)

undisputed that Etienne took no action whatsoever regarding Richardson, except to agree to meet with Woods, at his request, and for the purpose of clearing the air, more than a month after her interactions with Richardson.  (Tr. 1096:17-1097:11.)  If Etienne had an intent to retaliate against Richardson for his First Amendment activities, there is no plausible reason that she waited so long to do anything about it—and only act when, by coincidence, Woods reached out to her to request a meeting.  Moreover, both Woods and Etienne testified that Etienne's criticism of Woods was directed at his conduct as a manager, not at Richardson's First Amendment activities.  (Tr. 1097:12-20, 876:17-877:11.)  Further, Etienne had no reason to question Pratcher's account of his interaction with Richardson on June 10, given their longstanding relationship of trust and confidence and their work together in the effort to restore the integrity of the OSC in the wake of the Hevesi scandal.  (Tr. 1074:25-1075:23, 1076:3-1077:1, 1302:20-1303:18.)  Given this background, it was appropriate for Etienne to credit Pratcher's account of Richardson's behavior on June 10, especially since she had experienced unprofessional treatment by Richardson around the same time.  In any event, her belief in Pratcher's testimony provides no support for the claim that she had a retaliatory intent.

Additionally, the evidence is undisputed that both Defendants made plans with Woods to meet again after Labor Day, with Plaintiff present, for the purpose of repairing their relationship. (Tr. 1101:3-13 (Etienne), 1435:9-1436:22 (Pratcher), 886:15-18 (Woods), 1879:5-25 (Mathis).) In light of this evidence, no reasonable jury could find that they acted with the intent to take retaliatory action against Richardson.

Furthermore, there is abundant evidence that other individuals who supported S.6888 were not only *not* retaliated against, but were in fact awarded additional business by the Comptroller's Office following their campaign in favor of the bill.  *See Elion v. Jackson*, 544 F.

Supp. 2d 1, 8 (D.D.C. 2008) ("'an employer's favorable treatment of other members of a protected class can create an inference that the employer lacks discriminatory intent'").  Seth Bryant, the lawyer for CUP—one of the two principal CUP contacts with the OSC about the bill, who won an award from the Governor for his central role in the lobbying efforts—was rewarded with new business by the OSC rather than facing any retaliation.  (Tr. 636:10-637:1.)  Brian Mathis and Robert Azeke reported similar business success with the OSC following enactment of the bill, even though they were CUP Board members, strong supporters of the bill and involved in CUP's lobbying efforts.  (Tr. 636:10-637:1, 1876:20-1877:25, 1872:10-18, 1493:8-1494:7.)  Indeed, the evidence shows that Pratcher affirmatively provided Mathis with assistance and advocacy in Mathis's efforts to obtain new business from the OSC (Tr. 1876:20-1877:17), contradicting any notion that he was retaliating against advocates for the bill.

For all these reasons, Defendants request judgment as a matter of law on the ground that no reasonable jury could find that either Defendant intended to retaliate against Plaintiff for his First Amendment activities.  In the alternative, Defendants move for a new trial on the ground that the jury's verdict was against the overwhelming weight of the evidence on this issue.

### D.  Defendants Are Entitled to Judgment as a Matter of Law Under *Mt. Healthy*.

Defendants also are entitled to judgment as a matter of law because no reasonable jury, properly instructed, could find that Defendants' actions were not protected under *Mt. Healthy*.  Even if the jury could properly find that Defendants were motivated to some extent by a desire to retaliate against Plaintiff for his First Amendment activities, the evidence shows that they would have taken the same actions regardless of any motive to retaliate.

Where a jury finds that a Section 1983 defendant acted with a motive to retaliate against the plaintiff for his protected First Amendment activity, a defense is available where the

defendant "show[s] by a preponderance of the evidence that it would have [taken] the same [action] . . . even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287.  The *Mt. Healthy* analysis "attempts to weigh the impact of the defendant's *impermissible* reason on the defendant's decision to act." *Greenwich*, 77 F.3d at 32. (emphasis in original).  The fact finder must "answer the hypothetical question, 'Would the defendant have taken the same adverse action even if the impermissible reason had not existed?'" *Id.*

Any reasonable juror, properly instructed, would have answered this question in the affirmative in this case.  The Court's instructions discussed above, however, erroneously instructed the jury that even if the Defendants were merely reacting to Plaintiff's conduct in the course of his conversations with them, that was sufficient to establish that they acted with a motive to retaliate.  Essentially the same language was repeated in the section of the instructions concerning the *Mt. Healthy* defense, when the Court instructed:

> If you find there were other, non-retaliatory motives for the defendant's action, then you must determine whether the defendant you are considering has proved by a preponderance of the evidence that the defendant would have taken the same action even in the absence of the plaintiff's speech on behalf of pending legislation, association with advocacy groups, or petitioning for legislation.

(Feinberg Decl., Ex. 3, at 25.)  Thus, the error in Instruction No. 6(B)(2) not only derailed the jury's analysis of Plaintiff's case-in-chief, as discussed above; it also infected the jury's analysis of Defendants' *Mt. Healthy* defense, because it erroneously led the jury to make no distinction between Defendants' reacting to the rude, unprofessional, and threatening aspects of Plaintiff's interactions with them and Defendants' acting out of a retaliatory motive.

Furthermore, the evidence at trial overwhelmingly demonstrated that Defendants would have taken the same actions notwithstanding any alleged retaliatory motive, for the same reasons discussed above.  In light of this evidence, a reasonable jury, properly instructed, would

necessarily find that Defendants would have spoken to Woods about Richardson's conduct, even if his rude, threatening, and disingenuous comments were uttered in the context of a debate about a local sports team rather than a discussion about the proposed legislation.

Accordingly, Defendants respectfully move for judgment as a matter of law on the ground that they are protected by *Mt. Healthy*, or in the alternative, for a new trial on the basis of the Court's erroneous jury instructions and the fact that the overwhelming weight of the evidence supports Defendants' *Mt. Healthy* defense.

### E. No Reasonable Jury Could Find That Defendants Proximately Caused Any Injury to Plaintiff.

Plaintiff also introduced insufficient evidence for a reasonable jury to find that Defendants' conduct proximately caused Plaintiff's alleged injuries. "[I]n any Section 1983 case, a 'plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury.'" *Deskovic v. Peekskill*, 673 F. Supp. 2d 154, 161 (S.D.N.Y. 2009) (quoting *Gierlinder v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998)). Furthermore, "[e]ven if a Section 1983 defendant's 'initial act is the 'but for' cause of some ultimate harm . . . [, he] is not legally liable for the harm if an intervening act is a 'superseding cause' that break the legal chain of proximate cause.'" *Id.* (quoting *Higazy v. Templeton*, 505 F.3d 161, 181 (2d Cir. 2007)). An "intervening exercise of independent judgment breaks the chain of causation," *id.* (citation omitted), unless those intervening events were "reasonably foreseeable[ ]" to defendants. *Higazy*, 505 F.3d at 177.

Plaintiff has failed to meet his burden of proving that Defendants were the proximate cause of his alleged injuries. No reasonable jury could find that Richardson introduced sufficient evidence to prove that his termination from ICV was the foreseeable result of Defendants' actions. Richardson had a long-documented record of poor performance at ICV. He had received numerous negative comments in his performance reviews, which addressed in particular

his problems with being abrasive and overly aggressive and spending too much time on outside activities, including CUP.   (*See, e.g.*, DTX E, at TLRLIT003295-3297;  DTX I, at TLRLIT003304; DTX R, at TLRLIT003300-003302.)   In his reviews, Woods repeatedly warned Plaintiff that he needed to cut back on his time with CUP and improve his professionalism and his demeanor, but Richardson refused or failed to do so.   (Tr. 820:17-829:4, 831:20-840:7, 276:4-277:9.)   As a result, Fisch urged Woods to fire Richardson as early as 2006.   (Tr. 824:8-826:2.)   Woods had also long been aware of issues where Richardson had offended other investors, such as Larry Morse and Denise Nappier (Tr. 840:11-848:3), and these prior incidents played a significant role in Woods' decisions regarding Richardson in 2010.   Richardson's productivity and investment performance had also long been a concern at ICV, as well as the fact that he was dramatically overpaid relative to his performance and productivity.   (Tr. 821:18-21, 828:22-25, 1787:3-1788:24.)   As a result, Fisch immediately advised Woods again to fire Plaintiff in 2010, as soon as Woods was contacted by Price—before Woods spoke to either Defendant, and before Etienne had done anything.   (Tr. 868:9-869:9.)

It is undisputed that neither Etienne nor Pratcher had any knowledge of these facts. These were the facts that led Woods and Fisch to seek to impose on Richardson the terms and conditions that they demanded on August 9 (Tr. 883:20-885:25, 1009:5-19, 1797:23-1801:19), but Defendants knew none of them.   Absent knowledge of these facts, there is no basis for the jury's determination that it was foreseeable to Defendants that their actions would lead to Plaintiff's termination.   This is especially so given that Defendants had urged Woods not to take adverse action against Richardson (Tr. 874:14-875:7, 879:13-21, 1256:6-1257:16; 1693:8-1695:8), and had made plans with Woods to meet after Labor Day, with Richardson, for the express purpose of repairing their relationship.   (Tr. 1879:5-25, 1435:9-1436:22, 886:6-18,

1101:3-13.)

In addition, no reasonable jury could find that Defendants proximately caused Richardson's termination because the record shows two intervening causes: first, Woods' decision to demand harsh terms of Richardson and ultimately terminate him; and second, Richardson's own decision to decline the opportunity to negotiate to stay at ICV and to instead demand his termination.   The evidence at trial showed that Woods was not inclined to fire Richardson following his meetings with Defendants.  (Tr. 881:12-18.)  Rather, he intended to offer Richardson terms that would allow him to remain a partner at ICV, not to fire him—as Plaintiff admitted in his testimony.  (Tr. 881:12-18.)  It was only after Woods consulted with many other individuals—Price, Ed Powers, Fisch, other employees at ICV, legal counsel, and others—that he reached his decision about what terms to seek from Plaintiff to correct what Woods saw as Richardson's long-term performance and personality issues.  (Tr. 881:12-882:23.)  Likewise, despite the expectation of Woods and Fisch that Richardson would negotiate with them (Tr. 885:13-18, 1801:20-1802:5), he refused to do so and demanded a termination letter.  (Tr. 888:16-18, 491:15-499:23; DTX I5, DTX K5, DTX L5.)  That decision was shocking to everyone—and certainly not foreseeable to Defendants.  (Tr. 1101:19-1102:5, 1439:4-6.)

Finally, there was insufficient evidence to support a jury finding that Plaintiff met his burden to prove that Pratcher's conduct caused the failure of ICV Growth.  As Plaintiff admitted, investors had serious reservations about the ICV Growth proposal, and it failed to attract any investors despite a full year of fundraising, which took place during the most significant recession in modern history.  (Tr. 894:7-901:18; DTX H5.)  Even before the events in June 2010, Richardson himself had urged Woods not to include ICV Growth in a presentation to ICV investors in May 2010 (Tr. 900:3-16, 517:7-12; DTX H5), and Woods had dropped any

- 41 -

reference to it.  (Tr. 900:6-16.)

Nor is there any evidence that the OSC would have invested in ICV Growth but for Pratcher's conduct.  Dawson confirmed that the OSC had substantial concerns about the merits of the proposal.  (Tr. 1686:16-1687:13.)  And, as discussed above, the undisputed testimony showed that Pratcher did not have the authority to kill the proposed investment, and in fact the OSC never made any final decision whether to make the investment.  *See* pp. 24-25, *supra*.

And even if the OSC *had* been prepared to make this investment, there was no evidence to support Plaintiff's claim that ICV would have been able to raise the additional $65 million in commitments required in order for the fund to launch.  (Tr. 893:8-903:21.)  Plaintiff's claim regarding ICV Growth is based on pure speculation, without a shred of real evidence.

## IV.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE AMOUNT OF DAMAGES, OR, IN THE ALTERNATIVE, TO A REMITTUR OR A NEW TRIAL.

On the Special Verdict Form, the jury determined that Plaintiff was entitled to recover $10,864,479 in compensatory damages from Defendant Pratcher and $7,242,986 from Defendant Etienne.  (Feinberg Decl., Ex. 4, at 4.)  Plaintiff now claims that he is entitled to recover the aggregate sum of these two figures, or a total of $18,107,465.  Defendants submit that it is error to add together the amounts that the jury found could be recovered against the individual Defendants.  The bulk of Plaintiff's alleged injuries sought from both Defendants—damages from his termination from ICV—is identical, and indivisible; allowing Plaintiff to recover two separate sums from each Defendant would impermissibly permit him to make a double recovery. Plaintiff sought damages from Pratcher alone with respect to ICV Growth, but there is no factual basis for holding that Etienne was responsible for $7.2 million (or any amount) beyond what the jury found Plaintiff may recover from Pratcher.

Furthermore, an award of $18.1 million in damages here would be excessive as a matter

- 42 -

of law.  To prevent this result, Defendants respectfully request that the Court clarify in entering judgment—assuming that the Court has rejected Defendants' other contentions in this motion, and that Plaintiff is entitled to any damages at all—that the total amount of damages Plaintiff may recover is $10,864,479, of which up to the full amount may be recovered from Pratcher and up to $7,242,986 may be recovered from Etienne.   Absent such relief, in the alternative, Defendants request a new trial.

### A.  Plaintiff Is Not Entitled To A Double Recovery.

"A basic principle of compensatory damages is that an injury can be compensated only once."  *Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996).  This principle prohibits "[d]uplication" of "awards against different defendants."  *Id.   See Bosco v. Serhant*, 836 F.2d 271, 280 (7th Cir. 1987) ("A tort victim can obtain only one recovery for his harm, no matter how many tortfeasors inflicted it.").   The Second Circuit has explained that, where multiple defendants are accused of causing a single injury, "once an award of damages had been determined for an injury, there may not be additional compensatory damages for that same injury from two or more defendants."  *Bender*, 78 F.3d at 793; *see Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark*, 39 F.3d 812, 821 (7th Cir. 1994) (Posner, C.J.) ("Where, as in this case, the injury to the plaintiff is indivisible, the jury should be asked to assess the damages caused by the injury, unless (as was not the case here) the jury is asked to assess the relative fault of the defendants for purposes of contribution among joint tortfeasors").   Indeed, where the plaintiff has only alleged a single injury, permitting recovery of aggregate amounts from multiple defendants is "plain error," even where the defendant did not object to the verdict form before the verdict.  *Bender*, 78 F.3d at 795; *Rodick v. City of Schenectady*, 1 F.3d 1341, 1348-49 (2d Cir. 1993) (ordering new trial on damages, despite failure to object to jury charge, where "[b]y placing separate entries next to each officer's name, the [special verdict] form suggested to the

jury that it could assess separate damages against each of the defendants.").

In *Bender*, the plaintiff alleged malicious prosecution against two police officers.  78 F.3d at 794.  The Court of Appeals held that because "the wrongful maintenance of those charges can result in only one award of damages," the jury's award of "$80,000 against Lt. Timmes and the $150,000 against Officer Corpes" for the same offense constituted "duplication."  *Id*.  Holding this was plain error, the Court ordered a new trial "unless a remittitur is accepted."  *Id*. at 795.

This Court is not required, however, to order a new trial.  Instead, the Court may also avoid duplicative damage awards by ruling that "the highest assessment of compensatory damages against any of the jointly liable defendants placed a ceiling on the recovery of compensatory damages," and enter judgment only for the highest sum awarded.  *See, e.g.*, *Bosco*, 836 F.2d at 281 (citation omitted); *Prosser & Keeton on the Law of Torts*, § 47.

Here, Plaintiff's interpretation of the damages award—*i.e.*, that it is permissible to add together the amounts he was awarded against each Defendant—is contrary to the Court's instructions to the jury, and is mistaken as a matter of law.  The Court's instructions stated:

> The plaintiff is only entitled to one recovery on the claims in this lawsuit sufficient to reasonably compensate him for his injury.  If you find that the plaintiff is entitled to recover against more than one defendant, or on more than one legal theory, you may still only award damages sufficient to reasonably compensate the plaintiff for injuries caused by the deprivation of his rights.  In other words, you may not award damages to the plaintiff in excess of the total amount of damages that you will find compensate him for his injury.

(Feinberg Decl., Ex. 3, at 43.)   The Court also instructed: "If you have found that both defendants are liable to the plaintiff, then you must consider damages separately, and award damages as against that defendant that the plaintiff has proved were actually and proximately caused by the conduct of that defendant."  (*Id.* at 36.)

Plaintiff's interpretation of the Special Verdict Form is contrary to these instructions.  It presumes that the jury ignored the Court's instruction that it could not award multiple sums of

damages based on the same injury.  The more reasonable interpretation of the Court's instructions is that the jury was to calculate the total damages Plaintiff had sustained, and then identify what portion of that award each Defendant was liable for, based on his or her individual actions.  If both Defendants caused the full scope of Plaintiff's claimed injuries, the amounts the jury specified in the Special Verdict Form would have been the same for each Defendant.  But if the jury found that one Defendant proximately caused injuries that the other did not, then the amounts specified for each Defendant would be different, as the jury found here.

Indeed, the Court predicted a similar result at the Charge Conference, when it explained:

So then you're faced with two defendants and the alleged loss to the plaintiff from his interest in ICV because he's cut off from ICV.  Perfectly reasonable for the jury to make some conclusions about how responsible each defendant was for the plaintiff's separation from ICV.  The jury could well determine that one defendant wasn't liable at all, or if one defendant was liable, that that defendant was liable to a much lesser degree than the other defendant.  So what do you do with that?  We know that the plaintiff can't recover more than the total of his injury, and so the jury is instructed to that degree."

(Tr. 1953:19-1954:5.)  The clear import of the instructions, the Court stated, was that "the jury determines the amount that each defendant should be liable for."  (Tr. 1954:23-24.)  Thus, assuming the jury followed the Court's instructions, it is clear that the jury determined that Plaintiff had sustained approximately $10.8 million in damages in total, but that Etienne's conduct only caused approximately $7.2 million of that harm.

This interpretation of the jury award is also consistent with the evidence at trial.  The amount the jury awarded against Etienne is exactly two-thirds of the amount the jury awarded against Pratcher.  It is perfectly logical for the jury to find that Etienne was only liable for a portion of the damages the jury awarded against Pratcher.  Only Pratcher bore potential liability

for damages allegedly arising from the failure of ICV Growth.  (Tr. 1952:14-20.)[10]   And—consistent with the Court's comments at the charge conference—the jury could reasonably conclude on the evidence that Etienne was less culpable that Pratcher, and should only be responsible for two-thirds of Plaintiff's damages.

By contrast, Plaintiff's interpretation would award him an impermissible double recovery for the harms he suffered.  As Plaintiff himself argued at the charge conference—putting aside ICV Growth (for which only Pratcher was liable)—the Defendants' conduct caused a single injury, *i.e.*, "caused the same action, the termination" from ICV.  (Tr. 1952:4.)  In this light, there is no factual basis in the evidence for holding that Plaintiff should recover damages from Etienne over and above the amounts that are covered by the damages award against Pratcher.  Permitting Plaintiff to recover aggregate sums from both Defendants for the same harm would impermissibly duplicate his recovery.

Indeed, Plaintiff's interpretation would render the Court's submission of the Special Verdict Form to the jury reversible error.  In *Rodick*, the Second Circuit ordered a new trial on damages because "[b]y placing separate entries next to each officer's name, the [special verdict] form suggested to the jury that it could assess separate damages against each of the defendants." 1 F.3d at 1348; *see id*. ("Without instruction on these important rules of damage calculation, the verdict form was an invitation to the jury to come up with an erroneous damage calculation.").

Accordingly, the Court should enter judgment against Pratcher in the amount of

---

[10] The bulk of the difference between the amounts the jury awarded against Pratcher and Etienne could be attributable to Plaintiff's claimed damages from ICV Growth.  Plaintiff sought a total of $2,102,000 for carried interest and management fees arising from ICV Growth.  (Feinberg Decl., Ex. 8 (hereafter "Pl. Demonstr. Ex. 4"), at 9, 13, 14, 17.)

$10,864,479 and judgment against Etienne in the amount of $7,242,986, but make clear that the maximum amount that Plaintiff may recover in total is $10,864,479 and that any amounts recovered from Etienne will reduce the amount recoverable against Pratcher.  In the alternative, as in *Bender*, the Court should reduce the damages award to the amount awarded against Pratcher by remittitur, and order "a new trial unless a remittitur is accepted."  78 F.3d at 795.

### B.  The Damages Award Should Be Reduced Because It Is Excessive.

Even if the Court concludes that the jury intended to award $18.1 million in damages, Defendants submit that the damages award should be reduced by remittitur to $10,864,479 on the grounds that an $18.1 million verdict is excessive and contrary to the evidence.

Plaintiff's claim for $18.1 million in damages is excessive because it is impermissibly based on speculation and unreliable evidence.  It is well settled that a damages award based on speculation cannot be sustained.  *Sagendorf-Teal v. Cnty. of Rensselaer*, 100 F.3d 270, 277 (2d Cir. 1996); *Rivera v. Baccarat, Inc.*, 34 F. Supp. 2d 870, 878 (S.D.N.Y. 1999).  Here, Plaintiff's damages claims were overwhelmingly based, not on the damages he has allegedly suffered to date as a result of Defendants' conduct, but on his claims for future damages going more than twenty years into the future.  These claims impermissibly rely on speculation that ICV will continue to be stable, successful and profitable for years into the future, as well as speculation about the profitability of private equity in general and the overall state of the economy.[11] Plaintiff's claims entail an inordinate amount of speculation about the performance of investments that have not yet been made and funds which do not yet exist and may never exist.

---

[11] The speculative nature of Plaintiff's damages claims is discussed in detail in Defendants' Memorandum of Law in Support of their Motion *in Limine* to Bar Plaintiff's Claims for Front Pay And Other Speculative Damages, filed March 13, 2015, Doc. No. 118, at 1-3 and 18-25.

(Tr. 1585:19-1590:13, 1842:7-1843:5, 1902:25-1903:14.)  Moreover, Plaintiff is only entitled to damages that were proximately caused by Defendants, *see Frank Sloup & Crabs Unlimited, LLC v. Loeffler*, 745 F. Supp. 2d 115, 136-38 (E.D.N.Y. 2010), and Plaintiff's claims unjustifiably assume that Plaintiff will continue to be damaged by "the sting" of Defendants' conduct for twenty years into the future.  *See Rao v. N. Y. City Health & Hosps. Corp.*, 882 F. Supp. 321, 332 (S.D.N.Y. 1995).

Plaintiff's excessive damages claims were based on assumptions by his expert, Paul Engel, regarding ICV's future performance and Richardson's compensation that were unsupported by evidence.  (Tr. 1585:15-1589:8, 1557:5-20, 1572:13-1574:14, 1901:19-1902:24, 1903:7-14.) The analysis of Defendant's expert, Dr. Karl Snow—which Plaintiff chose not to challenge at all on cross-examination—addressed these assumptions, and his estimate of damages was much closer to the $10.8 million award that we believe the jury arrived at.

The record does not support Plaintiff's claims that he would have maintained his high level of compensation indefinitely into the future.  Woods and Fisch both testified that Plaintiff was insufficiently productive for his level of compensation.  (Tr. 805:25-806:20, 1787:3-22.) Indeed, years before Plaintiff's termination, Woods and Fisch discussed reducing Plaintiff's salary to more appropriately compensate him for the work he was actually doing, which was marketing-focused rather than revenue-generating.  (Tr. 825:19-24.)

Moreover, in calculating Plaintiff's damages, Engel repeatedly made assumptions about Plaintiff's future income and profits that were speculative, unreasonable, and completely slanted in Plaintiff's favor.  For example, Engel assumed that Plaintiff's base salary would increase by 4% per year, *ad infinitum* (Pl. Demonstr. Ex. 4, at 5; Tr. 1828:15-22.), even though base pay for people at his level in private equity firms tends to remain flat (Tr. 1829:13-19; PTX 588), and

Plaintiff himself had had the same base pay ($320,000) for years.  (Tr. 1572:17-19, 1831:18-1832:1.)  Engel also assumed that Plaintiff would have seen an increase in his share of the carried interest for ICV Fund III and future funds from 17% to 21%.  (Tr. 1521:18-1522:24, 1526:23-1527:12; Pl. Demonstr. Ex. 4, at 11-12.)  But there was no basis for this assumption, as Woods' share of the carried interest remained flat going from Fund II to Fund III, and the result assumed by Engel would have also given Richardson an increase in his share of management fees, at Woods' expense, when there is no reason to believe Woods would have agreed to that. (Tr. 905:8-23, 1830:23-1840:13.)

Moreover, the discount rates that Engel used to calculate the present value of Plaintiff's damages were inherently arbitrary and contrary to established economic principles.  (Tr. 1568:2-22, 1570:8-1572:12, 1584:11-1585:25, 1587:12-1589:8, 1904:1-18.)   And Engel manipulated these rates to favor Plaintiff's claims, using much smaller discount rates to value Plaintiff's hypothetical management fees from Fund III and future funds than he used for carried interest for investments for the same fund, thereby enormously inflating Plaintiff's hypothetical fee income.  (Pl. Demonstr. Ex. 4, at 11-12, 15-16; Tr. 1587:18-1590:13.)

Plaintiff's damages claims were also inflated because they did not provide a sufficient deduction for reasonable mitigation efforts.  The evidence at trial established that Richardson never made any effort to secure a new job; that instead he pursued founding his own private equity firm, not because it was reasonable, but because it was his dream; that he took no action at all to build this new firm (or engage in any other employment) for a full year after his termination; that he took no salary for four years; and that despite little success for most of the last five years, he never found it worthwhile to look at other opportunities.  (Tr. 526:1-557:24.) This is not reasonable mitigation, and Richardson's damages should be reduced by a substantial

degree—Snow testified up to $4.5 million—to account for what he could have earned had he engaged in reasonable mitigation.  (Tr. 1904:19-1909:5; Feinberg Decl. Ex. 9 ("Def.  Demonstr. Ex. C"), at 14.)

## **CONCLUSION**

For the reasons stated above, Defendants are entitled to judgment as a matter of law pursuant to Rule 50(b), or, in the alternative, clarification of the amount of the judgment or a new trial pursuant to Rule 59.

Dated:  June 5, 2015                    Respectfully submitted,
        New York, NY

                                        HOGAN LOVELLS US LLP

                                        By:____s/ Ira M. Feinberg_____
                                        Ira M. Feinberg, Esq.
                                        Theresa M. House, Esq.
                                        Patrick J. Dempsey, Esq.
                                        Susan Nabet, Esq.
                                        875 Third Avenue
                                        New York, New York 10022
                                        Tel.  (212) 918-3000
                                        Fac.  (212) 918-3100
                                        Email: ira.feinberg@hoganlovells.com
                                        Email: theresa.house@hoganlovells.com

                                        *Attorneys for Defendants Tyson Pratcher and*
                                        *Raudline Etienne*

## <u>CERTIFICATE OF SERVICE</u>

I, Patrick J. Dempsey, hereby certify that on June 5, 2015, I served by electronic mail and electronically filed Defendants' Memorandum of Law in Support of Defendants' Renewed Motion for Judgment as a Matter of Law with the Clerk of the Court using the CM/ECF system, which will send notification of such filing, to the following individuals:

John Siegal
Samir Kher Ranade
Baker & Hostetler LLP (NYC)
45 Rockefeller Plaza
New York City, NY 10111
Tel.: (212) 589-4200
Fax: (212) 589-4201
Email: jsiegal@bakerlaw.com
Email: sranade@bakerlaw.com

Stuart Evan Kahan
Richard Brodsky, Esq.
Oxman Tulis Kirkpatrick Whyatt & Geiger, LLP
120 Bloomingdale Road
White Plains, NY 10605
Tel.: (914) 422-3900
Fax: (914) 422-3636
Email: skahan@oxmanlaw.com
Email: richardbrodsky@msn.com

s/ Patrick J. Dempsey
Patrick J. Dempsey, Esq.